## WILLIAM *v.* STATE.

[82 South. 318, In Banc, No. 2676.]

HOMICIDE. *Murder or manslaughter. Question for jury.*

Under the facts in this case which was a prosecution for the murder of a deputy sheriff, while defendant was resisting arrest, the court held that it was a question for the jury whether defendant killed deceased because of malice or in a bona fide resistance of an attempt by deceased to force him by the use of unlawful means to surrender his pistol, within the provision of Code 1906, section 1237 (Hemingway's Code, section 967) providing that every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit a felony or to do any unlawful act, shall be guilty of manslaughter.

APPEAL from the circuit court of Washington county. HON. H. H. ELMORE, Judge.

Anthony Williams was convicted of murder and appeals.

The facts are fully stated in the opinion of the court.

*A. H. Turnage,* for ppellant.

*Ross A. Collins,* attorney-general for appellee.

PER CURIAM.

This is an appeal from a conviction for murder followed by a death sentence.

On the occasion in question, some sort of a show was being given in the town of Arcola with its accompanying crap game, in which game the appellant and Lucius Blevin, among others, were engaged. A controversy arose during the progress of the game between the appellant and Blevin, which Blevin shortly thereafter reported to the deceased and Tom Williams, both of

whom were deputy sheriffs, stating that the appellant had threatened him with a pistol. The deceased there-upon took the appellant into custody, and was joined shortly thereafter by the other deputy, Tom Williams. What then occurred, according to the state's theory, will be best told in the language of Williams, who testified on behalf of the state:

"Q. When you saw him next, he was under arrest with Mr. R. L. Williams, the dead man? A. Yes, sir.

"Q. Where was he when you saw him there? A. Out there back of a boarding house, down there at Arcola.

"Q. What was Mr. Williams doing with him? A. Mr. Williams was setting down on an old safe there, and the negro was standing out in front of him.

"Q. What did you do—go up where they were? A. Yes, sir.

"Q. Go ahead and tell what occurred from then on? A. Mr. Williams told me: 'Tom, this negro had a pistol here, and he has thrown it away. Let's look for it. Hold him here until I look for the pistol.' And I said: All right. He is just lying, though. He has it around here somewhere himself.' This negro said, 'I sent it home by my brother-in-law.' I told Mr. Williams he was lying; that he hadn't sent it anywhere. He looked around under the house a few minutes and couldn't find it, and I said: 'Well, he said he had it. That is sufficient, and he has been toting it around.' He said, 'If we get the pistol that will be better.' Then he said, 'We will take him on over there to the house,' and the negro said, 'I have my horse here, Mr. Williams,' and Mr. Williams said, 'Get the horse, Lucius,' and this negro, Mat Thomas, I told him to come too. We went across the railroad three or four hundred yards from where we started from, and he ran his hand down in here (indicating), and said his drawers were down. I noticed him by the light from the railroad. We could see

by that. It was dark there where we had been. The first thing I knew then he put the gun up to my cheek and shot me like that (indicating), and shot Mr. Williams in the side. I turned around and pulled my gun and made one shot. The first shot I shot in the ground right by him, and the next shot I made he ran off and shot at me twice. I asked Lucius for more shells, and he said, 'No, sir. . . .'

"Q. Who is Lucius? A. Lucius Blevin, a state witness. He said, 'No sir; I haven't got any shells.' He loaded up the second time and came back, and the second shot he run up behind me as I was crossing the railroad and shot me through the hand, and then shot me through the thumb, and Lucius said, 'Mr. Tom, please come on, that nigger's going to kill you,' and caught ahold of me, and I said, 'Turn me aloose,' and I went up to the section house and told Mr. Tom about it."

On cross-examination this witness further testified that while they were back of the boarding house, and while the appellant was held by Mat Williams and Lucius Blevin, he was struck, but twice only, with the buckle end of a trousers belt, and with nothing else, in order to make him tell where his pistol was.

The appellants evidence was in sharp conflict with that of the state's witnesses, and, if true, fully supported his claim that he killed the deceased in self-defense. His theory of the case is contained in the following questions and answers which appear in the transcript of his evidence in chief:

"Q. Go ahead and tell the jury all about that; they are going to decide whether you will be hung or not. A. Yes, sir; I will tell them the truth and nothing but the truth. Well, the way it was, from the first beginning, it started about a dollar and a quarter. Albert Kimberly put a dollar and a quarter down, and Lucius picked it up. Mat said, 'I shoot a dollar and a quarter.' He said: 'No, I don't shoot it; I put the money down

there.' And he looked around and said, 'Who got my
money?' The boy said: 'I ain't got it; you ain't put
any down there.' The boy asked me didn't he put it
down there, and I said: 'Yes, he put it down, two solid
halves and a quarter. I reckon he did. Lucias that time
run around to grab me to cut me, and another fellow run
in betwixt us, and said, 'No, I wouldn't do anything
like that,' and by that time I went out and got a brick,
and he said I drawed a pistol on him. I didn't do that.
Time I got out the house Mat come up and said, 'Boys,
I wouldn't have any trouble.' I said, 'I ain't doing
nothing, no use for me to let them run over me.' I had
a brick in my hand then and never pulled a pistol, at
all. After that I went around on the front part where
the show was and went back in the gambling house. That
time Mat was up in the box cutting off the game, and
finally Mr. Tom came in and Mat gets down and gives
somebody else his game. Then after he stood around
awhile Mr. Tom went to the door and got to whispering
around, and Mr. Tom left then. I don't know where
he went I suspicioned then—

"Q. What Tom was that? A. Mr. Tom Mosely.
After I heard that whispering and all going on, I said.
'Well, that fellow has told him I had a pistol or some-
thing.' That time I goes out then and hides this gun,
and time I goes and hides the gun I went back where
the boys gambling, standing up in there. After awhile
I went back out the door again, and Mr. Williams was
standing out there, and he walked up to me.

"Q. Which Williams was that? A. Mr. R. L. Wil-
liams. He came up to me and said, 'Where is the gun
at?' I said, I haven't any,' and he searched me and
didn't find any. He found a schabbard on me, and said,
'Where that gun at, nigger?' I said: 'I haven't got
any gun. I sent it home by my brother-in-law,' that
very way. So I walks on off, and he said, 'I told you
to stand here, not move any more.' I said, 'All right,

Cap,' and that time Mr. Williams sent for Mr. Tom, and I said, 'I am going to stand here and won't move any more.' That time Mr. Tom came up an ousted his gun and puts it in my face. I said: 'That's all right, white folks; I haven't got a pistol.' He curses me and says, 'You son of a bitch! You get it.' I said, 'I haven't got any gun.' He said, 'Boys, get him.' He said to me, 'Come around here,' and I went around there, and he called Mat and Lucius, and they carried me up there to the gin and taken me out there and made me pull my clothes off, and I begged them not to whip me and I would tell them where the gun. He said, 'No, you don't know where it is at.' And they stretched me out, one on my head and one on my feet. Mr. Tom grabbed his gun and hit me once on this side and once on this side (indicating). Mr. Tom grabbed the belt and hit me two licks and the buckle broke off then, and Mr. R. L. William said, 'Go in there and get a gin belt.' He said 'No, I can't get in there,' and that time Mr. Tom walks up and kicks me here on my mouth. My mouth commenced to bleeding all down here, and I said, 'Let me up, and I will go and get the gun.' They let me up then, and I put my clothes back on me. Blood was running down my face, and I said, 'Let me go get my horse,' and they told me go get your horse, and I said, 'All right, sir.' I went down there, and they wouldn't let me get the horse. Mr. Williams had a flashlight and looked all under the house where the boys was gambling, and he couldn't find it and searched my horse and couldn't find it, and he said, 'That nigger's got that gun, let's go carry him back to the gin,' and told me to get in front. I said: 'I will get it. Don't kill me.' He said, 'I will kill you if you don't.' I said, 'Lordy, if I don't get it I am killed, and if I do get it I am killed.' Mr. Tom was on the side of me. Mr. Williams was in front of me about as far as from here to Mr. Boddie, and this Mat was behind me, and Mr. Tom on the side

of me, and this Lucius in front of me like the gentleman sitting there, and he was leading the horse, and I said, 'Lord, horse, you about to walk over me,' and Mr. Williams said, 'She don't know you to-night, does she? I said, 'No, sir; she don't know me.'

"Go on and tell it all.   A. So that time Mr. Tom shot off, and that time I started to break to run.   I says: 'No, don't run.   If you do, he will kill you.'   One mind said, 'Get your gun,' and that time I eased up to my horse and got my gun from under the pummel of the saddle on my horse, and they makes a shot and I breaks to run, and I runs off in the weeds, and they makes four or five shots at me, and I was running, and I made three shots and run off in the weeds then.   They shot me here (indicating), and shot me there (indicating).   That is all.

"Q. Didn't you go back up there and shoot them some more?   A. No, sir; I did not."

Section 1237, Code of 1906 (1 Hemingway's Code, section 967), provides that: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

Judges ETHRIDGE, HOLDEN, and STEVENS are of the opinion that the appellant's contention that under this statute his conviction should have been limited to manslaughter should be sustained, and the judgment of the lower court reversed; their reasons therefor being set forth in a separate opinion.

Judges SYKES. COOK, and SMITH are of the opinion that on the evidence it was for the jury to say whether the appellant killed the deceased in the *bona-fide* resistance of an attempt by the deceased to do an unlawful act, viz. to force him by the use of unlawful means to deliver up his pistol, or whether he killed the deceased, not in order to prevent the commission of the unlawful

act, but because of malice engendered in him by the treatment he had just prior thereto received and was still receiving at the hands of the deceased; that if the appellant killed the deceased because of malice so engendered, and not in order to prevent the commission of the unlawful act, as the jury evidently believed, he is guilty of murder, and cite in support thereof *Long* v. *State,* 52 Miss. 23; *MaMaster* v. *State,* 29 So. 522; *Brown* v. *State,* 98 Miss. 786, 54 So. 305, 34 L. R. A. (N. S.) 811.

We find no reversible error at all in the other rulings of the trial judge of which complaint is made.

Affirmed, and Friday, the 29th day of August, 1919, fixed as the day for the execution of the sentence.

*Affirmed.*

HOLDEN, J. (dissenting). I think the judgment of the lower court should be reversed because under the statutes, section 1237 and 1044, Code of 1906, sections 967 and 772, Hemingway's Code, the crime committed was manslaughter only.

The facts of this deplorable tragedy as shown by the record may be briefly stated as follows: A controversy arose between the appellant, Anthony Williams, and another negro by the name of Lucius Blevin while they and other negroes were engaged in a crap game. Blevin testified that the appellant drew a pistol on him during the difficulty, whereupon he (Blevin) reported the matter to Mr. R. L. Williams deputy sheriff there at the village of Arcola. The deputy sheriff, R. L. Williams, thereupon arrested and searched the appellant, and, failing to find a pistol on him, sent for Mr. Tom Williams, another deputy sheriff, and the two white deputies, accompanied by the said Lucius Blevin and another negro by the name of Mat Williams, took the appellant with them "over the creek" back of the gin, where it appears, from the testimony of the state's witnesses as well as the testimony of the appellant, that Mr. Tom

Williams, who was then and there acting as a deputy sheriff, proceeded to administer unto the appellant a whipping, using a belt for the purpose, while the two negroes, Blevin and Williams, held the appellant down, one on his head and one on his feet. After having hit the appellant several licks with the buckle end of the belt, which Mr. Tom Williams says was a paper belt, the belt broke; and at this juncture appellant agreed to go and get the pistol if they would let him up.

It is conclusively shown by the state's testimony that the whipping of the appellant in the manner set out was for the purpose of making him disclose the whereabouts of his pistol. The two deputies and the two negroes let the appellant up and went with him toward the house of his brother-in-law where he had stated the pistol was located while he was being whipped upon the ground. After all of the parties had proceeded about three hundred or four hundred yards from the place where the whipping had been administered, there was some brief conversation between the parties, as it appears, regarding a show that was in the village of Arcola. The deputies were armed with pistols, and, as they proceeded toward the place where the appellant stated he had left the pistol, the appellant stopped and claimed that his underwear was coming down, reached his hand somewhere in his clothes, and drew a pistol and commenced to shoot, first at Mr. Tom Williams, wounding him, and then shot and killed Mr. R. L. Williams, Mr. Tom Williams then shot and wounded the appellant in three places.

The above statement of the case is based upon the testimony introduced by the state. The testimony introduced by the appellant was disbelieved and disregarded by the jury as it had the authority to do, and therefore is not to be considered as part of the proof in reviewing and discussing this appeal. The facts of the case are limited here to the proof introduced by the state.

Among the errors assigned by the appellant for reversal are: First, the verdict of the jury is contrary to the overwhelming weight of the evidence showing that the appellant acted in necessary self-defense to save his own life or prevent great bodily harm, the danger of which was then impending; second, that taking the testimony offered by the state as a whole, the appellant would be guilty only of manslaughter, if guilty of any offense; third, that the argument to the jury by the prosecuting attorney with reference to mob law was erroneously permitted by the court to the injury and prejudice of the appellant's rights at the trial.

The state contends that no error was committed in the trial court, and that, even though the appellant had been whipped and was unlawfully mistreated by the deceased and the others in the crowd, still appellant was guilty of murder because he shot and killed the deceased, the deputy sheriff Mr. R. L. Williams, at a time when he was in no imminent danger of losing his own life or suffering great bodily harm at the hands of the deceased or any other person, and that such killing was unnecessary and was done with malice aforethought.

The first contention of appellant that he was acting in self-defense when he shot the deceased because of the unlawful whipping he had received, and which he expected would be repeated upon him again in a few minutes, as soon as the deceased and the other had discovered the lie he had told as to the location of the pistol in order to be let up from the ground, and that he reasonably anticipated this impending danger, and that he was not required by law to wait until he was in a situation where he could not defend himself against such treatment, is, I think, untenable because the question of impending danger at the time of the shooting by the appellant was one for the determination of the jury, and the jury decided this issue against the appellant.

The complaint of the appellant as to the remarks and language used by the prosecuting attorney in his argument to the jury deserves notice. In his argument the prosecuting attorney said to the jury:

"Be it said to the eternal credit of the good citizens of Arcola that they permitted this defendant to have a fair trial here in a court of justice, rather than take their vengeance at the hands of an angry mob."

I disapprove of this character of argument to the jury, and wish to respectfully announce again that prosecuting attorneys should refrain from referring to mobs or mob law in the trial court of a human being in a court of justice. The inferences calculated to be drawn from such comment by prosecuting attorneys are likely to be prejudicial to the rights of the accused in securing a fair and impartial trial of his case. I think it was error in the court to permit the prosecuting attorney to use the language complained of in the argument of the case before the jury. However, it is unnecessary to discuss whether or not this error would cause a reversal if there was no other reversible error in the case.

The point advanced by counsel for appellant that the evidence introduced by the state does not warrant a conviction of murder, but at best would only justify a conviction of manslaugher, is based principally upon our statutes, sections 1044 and 1237, Code of 1906, sections 772 and 967, Hemingway's Code, which reads as follows:

"Sec. 1044. If any person assault and beat another with a cowhide, whip, or stick, having at the time in his possession a pistol or other deadly weapon, with intent to intimidate the person assaulted, and prevent him from defending himself, he shall, on conviction, be imprisoned in the penitentiary not longer than ten years."

"Sec. 1237. Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act,

or after such attempt shall have failed, shall be guilty of manslaughter.''

The case presented by the state, and as shown particularly by the testimony of Mr. Tom Williams, one of the deputies who was shot by the appellant, substantially shows that the two armed deputies, one of whom was killed, together with the two negro men, searched the appellant to find his pistol, and, failing in this, they then took him across ''the creek,'' and while, the two negro men held him down one of the deputies proceeded to whip him for the purpose of making him tell what he had done with the pistol. In order to be relieved from the pain of this unlawful chastisement, the appellant told the officers a lie as to where the pistol was located and offered to go with them to get it. They let him up and proceeded with him under unlawful duress in the mission of getting the pistol, and before they reached the place to which they had started the shooting took place and one of the deputies, Mr. Robert Williams, was killed.

The defendant testified that he was kicked in the face, whipped with the strap, and beat with a pistol. The jury did not believe him; consequently, I discard his statement as to those things. But I do know from this record as testified to by the state's witnesses that these two deputies, without any warrant for arrest or seizure and search, arrested the appellant, searched him and proceeded to extort from him by corporal punishment the whereabouts of the pistol to be used as incriminating evidence against him. The appellant made no resistance to the arrest or search. The deputies, acting under the badge of the law, did not then take the prisoner to jail or proceed to charge him in an orderly way with violation of the law, but proceeded and continued to carry out the assault and unlawful mission of compelling the disclosure of the weapon. It was the duty of these officers to not only refrain from subjecting

their prisoner to violence, but it was their legal and moral duty to protect the appellant while in their custody from such unlawful assault. They failed not only in their duty, but this record shows that they actually participated in the unlawful violence to their prisoner. With reference to the unlawful assault and whipping of appellant, the Attorney General says in his brief that: "It may perhaps be an effective method to acquire information, but at the same time it must receive the condemnation of the courts of law and justice."

That these officers were in danger from the concealed pistol in the clothes of the appellant is quite true, but it must be remembered that the perilous situation was brought about entirely by the deceased and his associates. The conduct and proceedings of the two white deputies and their two negro assistants were unlawful from the beginning of the whipping until the time of the beginning of the whipping until the time of the fatal shooting. Therefore I think the case comes within section 1237 above referred to, and that the contention made by the appellant that this homicide can only be manslaughter is well taken and should be sustained.

It is urged by the state that the question as to whether or not the appellant was guilty of murder was a question property submitted for the determination of the jury; that it was a question of fact as to whether the appellant shot the deceased with malice aforethought at a time when unnecessary to do so, and after an interval of cooling time between the whipping and the shooting in which the appellant formed the premeditated design to kill the deceased. I think this contention by the state is unsound, in view of the statute and the uncontroverted facts of the case. Under section 1237, the killing is declared to be manslaughter if unnecessarily done while resisting the attempt to do an unlawful act or immediately after such attempt had failed. The appellant fired the fatal shot in this case while the de-

ceased was still in the actual commission of the unlawful act commenced by the unlawful assault and whipping, and continued by compelling appellant to go with the parties and produce the self-incriminating pistol. If the attempt or commission of the unlawful act by the deceased had failed or had been abandoned, and any considerable length of time had elapsed thereafter before the killing occurred, then in that case the jury, and not the court, should determine the question of whether the killing was done with malice aforethought. But where, as in this case, the attempt and actual commission of the unlawful act by the deceased was resisted by the slayer, without actual malice previously formed, and such resistance resulted in the death of such offending person, it is only manslaughter under the statute, and was a matter of law for the court to pass upon as to malice and not a question of fact for the jury. *Long* v. *State,* 52 Miss. 23.

The appellant, it appears from this whole record, had no malice or ill feeling toward the deceased prior to the whipping. They were strangers to each other, and the motive for the shooting was the unlawful treatment imposed upon appellant which continued in ·connection with and as part and parcel of the unlawful assault and whipping by the deceased, until the fatal shot was fired. The provocation was sufficient, as a matter of law and facts, to negative an inference of previous malice on the part of · appellant. Evidently the appellant was merely resisting the unlawful acts of the deceased in an effort to free himself from the illegal imposition and further prospective bodily punishment. If he had shot and killed the deceased at the time he was being whipped on the ground, no one would hardly contend it was murder; but it appears that he did not shoot at that time, as he was overpowered and covered by his assailants but he did resist in the only effective manner apparent to him as soon thereafter as possible. He·made no

resistance to his search by the officers.  He was whipped solely because he refused to furnish the incriminating evidence against himself. The deceased and his associates did not abandon their unlawful purpose after they had whipped appellant, but continued to pursue it by further intimidating and forcing appellant to go with them for the pistol.  While thus engaged in this unlawful mission, the deceased was killed.  There was no interval of time between the whipping and shooting in which the hot blood caused by the unlawful provocation could cool. The walk from the place of the whipping to the place of the shooting occupied but a few minutes, and, regardless of what was said about ''a show in Arcola,'' the heat of passion and anger was still in the breast of appellant from the whipping and continued unlawful treatment.  Under these facts and circumstances, I think we would be warranted in holding that as a matter of law the killing was no more than manslaughter.

In *Long* v. *State,* 52 Miss. 23, in considering the intent and purpose of section 1237, the court, speaking through Justic CHALMERS, said:

''We must think that the 'unlawful act' spoken of means a crime or misdemeanor.  The language is 'to commit a felony, or to do some other unlawful act.'  The unlawful act, we think, must be of a criminal nature, even though inferior to felony.  We think, further, that the killing must take place either during the actual resistance to the unlawful act, or immediately following its defeat and abandonment.  If it occurred after the lapse of any considerable period, it would seem impossible to divest it of the elements of malice.  Thus construed, the statute amounts to this: If I see another engaged in the commission of an offense against the criminal laws and I resist its accomplishment, and in such resistance slay the person so engaged, my crime will be manslaughter and not murder, even though the act of killing was unnecessary to the defeat of his act;

and the same result will follow where the killing ensues instantly after the abandonment by him of his attempt. Because I was engaged, or had just been engaged, in resisting the doing, by him, of an unlawful act, the law will, to some extent, throw the mantle of charity over the necessary slaughter committed by me, by reducing my offense from murder to manslaughter. It amounts to a legal imputation to heat of blood for my benefit, whether in point of fact the jury should believe that there was such heat or not.

"The party slaving, however, cannot take shelter under it if the jury should be of opinion that there was actual malice. The killing must have occurred *bona fide* in the resistance to the unlawful act; or immediately after its defeat, and must have grown out of the commission, or the attempt to commit the act, and not out of any previous ill will, nor any personal grudge then and there engendered."

I think the case at bar comes within the intent and purpose of section 1237, Code of 1906. It means that "a legal imputation of heat of blood" is to be indulged in favor of the slayer, where it clearly appears that he did the killing while resisting the commission of the unlawful act, and that the unnecessary slaughter was not committed by him with previous malice or after a considerable time had elapsed between the commission of the unlawful act and the time when the fatal shot was fired. There was no interval of time here in which the slayer might reflect and cool, but the unfortunate killing was done while the unlawful act was actually being committed by the deceased. It was undoubtedly one and the same unlawful transaction from the time of the whipping until the time of the shooting, which was but a few minutes thereafter. There was no abandonment of the commission of the unlawful act by the deceased. If the appellant had been released after he was whipped, and any considerable time had elapsed, and he had then

killed the deceased, the jury would be warranted in finding a verdict of murder because there would have been an interval of cooling time in which the malice aforethought could have been formed. But the killing here was done during the commission and continuance of the unlawful act of the deceased.

The staute, section 1237, Code of 1906 (section 967, Hemingway's Code), necessarily implies an intentional killing, otherwise it means nothing; a proposed but unnecessary killing, a killing which but for the statute would be murder; and, since malice is a necessary ingredient of murder, to hold that if the homicide was malicious the satute does not apply would be to leave no field for its operation. If the killing was without malice, it would not be murder, and the statute would not be needed; if the existence of malice excludes its operation, it is repealed by construction. True, one cannot take refuge behind its provisions to wreak a personal pre-existing malice; nor lie in wait, as in the Brown Case, to execute a formed purpose to kill. But when, as here, it is manifest that the intention to kill was formed because of the criminal act of the deceased, in repelling that act the offense, which but for the statute would be murder, is by its plain meaning reduced to manslaughter. Malice is not predicable under the facts of the case before us. *Beasley* v. *State,* 64 Miss. 522, 8 So. 234; *State* v. *Hill,* 20 N. C. 629, 34 Am. Dec. 396; *Cryer* v. *State,* 71 Miss. 467, 14 So. 261; *Ayres* v. *State,* 60 Miss. 709.

A close examination of the authorities will disclose that this opinion is not in conflict with the rule as laid down in any of the cases.

I shall not take the time to discuss the distinction between the holding in the case at bar and the decisions cited as supporting the contrary view; but I may call attention to what must be obvious, that in the *Brown Case,* 98 Miss. 786, 54 So. 305, 34 L. R. A. (N. S.) 811,

from the facts there shown, clearly a previous malice or prior premeditated design existed on the part of the slayer, who had not only threatened to commit the homicide, but who had armed himself with a deadly weapon and lay in ambush for the purpose of doing the killing. This Brown Case seems to hold also (which by the way was a decision of the question of murder or manslaughter not in the appeal because the jury had acquitted of the murder and found the appellant guilty of manslaughter) that: "Malice essential to a conviction of murder may be ascertained from previous threats and measures taken in preparation, and, too, may arise suddenly and be implied from circumstances as from the intentional use at the outset of a deadly weapon."

But when the Brown Case is read and digested, it plainly appears that there was proof in the case that the malice aforethought was formed long previous to the time of the killing and some time before the deceased was in the commission of the unlawful act, and that the malice may have been implied as existing prior to the fatal shooting, that is, that the malice aforethought could have arisen under the facts there immediately before the shooting took place. But it will be observed that in the *Brown Case* and in the *Long Case,* 52 Miss. 23, and the other cases cited, there was an interval of time, either before the commission of the unlawful act by the deceased or immediately thereafter, in which the slayer had sufficient cooling time, or was already cool, to deliberately design and execute the killing with malice aforethought; but in the instant case the facts are essentially different, in this, that from the time the unlawful assault of the slayer was commenced and continued by the deceased until the time of the fatal shot, the slayer, having had no previous ill will or malice against the deceased, did not have any interval of considerable time in which to form premeditation and malice against the deceased before the shooting

took place; it being one continuous unlawful transaction. Therefore we may say that it appears conclusively to us that under the facts of the instant case, the conviction, either under section 1237, Code of 1906, section 967, Hemingway's Code, or the common law and statutes on manslaughter, could have been for no more than manslaughter, as a matter of fact and law. *Beasley* v. *State,* 64 Miss. 518, 8 So. 234; *Kelly* v. *State,* 68 Miss. 344, 8 So. 745; *Long* v. *State,* 52 Miss. 40.

STEVENS and ETHRIDGE, JJ., concur in the above opinion.