## WILLIAMS *v*. STATE.

[90 South. 705. In Banc. No. 22195.]

1. HOMICIDE. *Situations under which felonious homicide is "manslaughter" stated.*

    A felonious homicide is "manslaughter," and not murder, first, when the defendant killed the deceased either in the heat of passion, without malice, by the use of a deadly weapon, without authority of law, and not in necessary self-defense, or, second, when the defendant killed the deceased without malice, under the *bona-fide* belief, without reasonable cause therefor, that it was necessary for him so to do in order to prevent the deceased from inflicting death or great bodily harm upon him, or, third, when the defendant unnecessarily killed the deceased while resisting an attempt by the deceased to commit a crime.

2. HOMICIDE. *Defendant's guilt of manslaughter a jury question; where it appears defendant killed deceased in resisting an attempt to commit a crime, it is error not to instruct that defendant could not be convicted of murder.*

    When it appears from the evidence in a trial for murder that the defendant killed the deceased in resistinfi an attempt by the deceased to commit a crime, it is error to refuse an instruction requested, by the defendant directing the jury not to convict him of the crime of murder.

HOLDEN, J., dissenting. ETHRIDGE and ANDERSON, JJ., dissenting in part.

APPEAL from circuit court of Attala county.
HON. T. L. LAMB, Judge.

Joe Williams was convicted of murder and sentenced to death, and he appeals. Reversed and remanded.

*D. H. Glass, J. T. Crawley* and *J. D. Guyton,* for appellant.

*D. C. Enochs,* assistant attorney-general, for the state.

SMITH, C. J., delivered the opinion of the court.

This is an appeal from a conviction of murder followed by a judgment imposing the death penalty. The appellant, a negro, was taking his meals at the home of Caroline Ashford, in the town of Kosciusko. About five thirty p. m. on February 5, 1921, he went to the home of one of Caroline's neighbors for the purpose of purchasing some milk, and while there was requested by the owner of the premises, in event he should go to town, to tell her son to come home; her reasons for so doing being that there were two drunken men in front of her house, one of whom was Victor Dagenhardt, a white man, who was killed a few minutes thereafter by the appellant. Instead of going into town to deliver the message, the appellant asked one of the neighbors to do so over the telephone, and returned to Caroline Ashford's.

Caroline was not at home, but her daughter, Jazabelle Jones, was, and it appears from her testimony, she being the only eye-witness to the killing other than the appellant, who did not testify, that when the appellant returned he entered the house hurriedly, and closed the door, being followed immediately by Dagenhardt, in his drunken condition, who shook the door violently and said, "You black son of a bitch, open the door," to which the appellant replied that "he wasn't going to do it; that it wasn't no white folks' house." Dagenhardt then left, but returned almost immediately and repeated his demand for entrance. The appellant again declined to admit him, and picked up a single-barrel shotgun from behind a dresser in the room, appearing to the witness to be badly frightened, by which time Dagenhardt succeeded in forcing the door open, and, as he came into the room, which he did immediately after forcing the door, the appellant shot and killed him. Dagenhardt was unarmed. The appellant made no attempt to escape, but surrendered to the sheriff.

Jazabelle Jones was introduced as a witness by the appellant, and not by the state. Her credibility was attacked

by the introduction by the state of statements she had made shortly after the killing that when Dagenhardt left the door, and before he returned thereto, "she told Joe Williams that if Mr. Dagenhardt came back not to hurt him; that he was drunk, and that there wasn't any harm in him." She denied having made this statement, or that she so admonished the appellant.

Dagenhardt seems to have been an habitual drunkard, and it was his custom, when drunk, to go to the home of a negro man by the name of Johnson who lived about one hundred yards from Caroline Ashford, and remain there until he became sober.

The cause was submitted to the jury on the theory that the appellant was either guilty of murder or killed Dagenhardt in self-defense.

The appellant requested, and was refused, an instruction directing the jury to find him not guilty, and also an instruction directing the jury not to find him guilty of the crime of murder. No instruction was requested by either the state or the defendant submitting to the jury the law of manslaughter.

The ground upon which the appellant claims he was entitled to an instruction directing the jury to find him not guilty is that he killed Dagenhardt in order to prevent him from unlawfully entering the house in which the appellant was. The commonlaw right of a person to kill one attempting to unlawfully enter his dwelling or habitation is embraced with the provisions of section 1230, Code of 1906 (section 960, Hemingway's Code, par. [e]), and is simply that he may kill such a person when necessary to prevent his entry into the dwelling or habitation for the purpose of inflicting death or great bodily harm upon some occupant thereof, or of committing some other felony therein. 13 R. C. L. 840; 1 Wharton on Criminal Law (11 Ed.), p. 806. Assuming for the sake of the argument that the appellant was such an occupant of Caroline Ashford's house as to entitle him to the benefit of this rule, whether or not Dagenhardt was attempting to enter the house for

the purpose of inflicting death or great bodily harm on an occupant thereof, or of committing some other felony therein, and whether or not it was necessary for the appellant to kill him in order to prevent him from so doing, in the opinion of Judges COOK, SYKES, and SMITH, were at most, viewing the evidence most favorably for the appellant, question for the jury. The views of Judges ANDERSON, ETHRIDGE, and HOLDEN in this connection will be found set forth in separate opinions.

There are three theories under which the appellant could be guilty of manslaughter: First, that he killed the deceased "in the heat of passion, without malice, by the use of a deadly weapon, without authority of law, and not in necessary self-defense" (section 1238, Code of 1906, [section 968, Hemingway's Code]); second, that he killed the deceased without malice, under the bona-fide belief, but without reasonable cause therefor, that it was necessary for him so to do in order to prevent the appellant from inflicting death or great bodily harm upon him; and, third, that he unnecessarily killed the deceased while resisting an attempt by the deceased to commit a crime (section 1237, Code of 1906 [section 967, Hemingway's Code]).

The appellant's guilt of manslaughter vel non under either of the first two of these theories is, in the opinion of all of the judges, a question for the determination of the jury; but all of them except the writer are of the opinion that, under the provisions of section 1237, Code of 1906 (section 967, Hemingway's Code), the appellant should not have been convicted, in any event, of a greater crime than manslaughter, for the reason that he killed the deceased while resisting an attempt by the deceased to commit a crime, and consequently that the court below erred in refusing his request for an instruction directing the jury that it could not find him guilty of murder; for which error its judgment must be reversed.

The writer is of the opinion that this instruction was properly refused, and will now briefly set forth his reasons therefor: The statute here invoked, and which the

reporter will set out in full,[1] does not reduce a killing which would be a murder at common law to manslaughter unless the deceased was killed in the *bona-fide* resistance by the appellant of the commission of a crime. It affords the slayer no protection if he killed the deceased, not to prevent him from committing a crime, but because of malice previously entertained, or then and there engendered. *Long* v. *State,* 52 Miss. 23; *William* v. *State,* 120 Miss. 614, 82 So. 318; *Williams* v. *State,* 121 Miss. 433, 84 So. 8. The hurried manner in which the appellant entered the house and closed the door, and his being followed immediately by the deceased, indicates that something had occurred on the outside that was disagreeable to the appellant, which fact, together with the vile epithet applied to him by the deceased, and the further fact that the deceased was forcing an entrance into the house, may have so aroused the appellant's resentment, as his reply to the deceased's request to open the door seems to indicate, that he killed the deceased because thereof, and not simply to prevent him from committing a crime, and, if the jury should so find, and that question should be left to its determination, the crime committed by the appellant is murder, and not manslaughter. Moreover, what crime, if any, the deceased was committing at the time he was killed is by no means clear, and if, in entering the house, he was committing a crime, the character thereof will depend on the intent with which he entered. For instance, the crime would be burglary if his entry into the house was for the purpose of committing a crime therein, and forcible entry

---

[1] Sections 967 and 968, Hemingway's Code, are as follows:

967. (1237.) *Homicide—Killing Unnecessarily, While Resisting Effort of Slain to Commit Felony or Do Unlawful Act.*—Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter.

968. (1238.) *Homicide—Killing with Dangerous Weapon in Heat of Passion.*—The killing of another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.

if for the purpose of taking possession of the house. Why Dagenhardt wished to enter the house is not clear, and will never be known unless his reason for so doing is within the knowledge of the appellant, and he should disclose it. It may have been to assault the appellant because of something that occurred on the outside of the house, or he may have mistaken the house for that of Johnson, to which he was accustomed to go when drunk. It may be that, under the construction placed on the statute here in question in *Long* v. *State,* 52 Miss. 23, it cannot be invoked by the appellant if the deceased's intention in entering the house was to assault him, but I will concede for the sake of the argument that it can be, and I will also concede that, although the deceased may not have been attempting to commit a crime, the appellant is entitled to the protection of the statute if he honestly believed that the deceased was attempting to commit a crime, provided such belief was induced by such conduct on the part of the deceased as would have induced a reasonable man to so believe; but this question also, in my judgment, is for the determination of the jury.

*Reversed and remanded.*

HOLDEN J. (Dissenting).

From the undisputed facts of the case, which are fully set out and discussed by both the main and dissenting opinions, I am convinced that, as a matter of law and natural justice which should be rendered unto every human being, the appellant is guilty of no crime, because he acted as any reasonable man would have acted in shooting an apparently dangerous drunken man who was actually breaking into his residence over his protest, and after repeated refusals by appellant to let him in.

That the appellant could reasonably assume that the drunken stranger would commit a crime after he had entered the house seems to me to be true beyond question; therefore to stop the unlawful breaking and entering of the home over appellant's protest he was warranted in

shooting deceased.   The case is one where a negro killed
a white man, and the record shows the white man was
out of his place, and unlawfully and feloniously attempting
to invade the domicile of appellant.

There is no room for a finding of murder under any view
of the facts, unless the undisputed facts be wafted to the
winds by imagination and conjecture.   See section 1237,
Code of 1906 (section 967, Hemingway's Code) ; *William*
v. *State,* 120 Miss. 614, 82 So. 318; *Williams* v. *State,* 121
Miss. 433, 84 So. 8.

ETHRIDGE, J., (Dissenting in part).

I am unable to reach the conclusion that there was suf-
ficient evidence in this case to submit to the jury to war-
rant a finding of manslaughter.   I concur in the decision
that, if guilty at all, the crime would amount only to man-
slaughter.   The appellant was in a place where he had a
right to be, and where he took his meals.   On the evening
in question he went out to procure some milk, and, passing
the residence of a white lady, who was a witness in the
case, she requested him to notify her son that there were
some drunken people in front of her house, and to come
home.   He went to a neighboring house and got some white
people to telephone into town to this lady's son, and re-
turned and informed the lady that he had procured some
one to telephone for her son, and he bought some milk from
this lady and returned to the place where he boarded.   He
was followed to the house by the deceased, the deceased
being a white man and the defendant being a negro, and
went into the house and closed and locked the door.   The
deceased came in a drunken condition to this house, and
tried forcibly to enter the door, cursing the appellant, and
demanded that he open the door, which the appellant re-
fused to do.   The deceased then went away for a few min-
utes, and returned and ran against the door, trying to
open it, cursing the appellant, and demanding that he
open the door.   Appellant picked up a shotgun in the room,
and told deceased that he would not open the door; that

"this ain't no white folks' house." The deceased again ran against the door, and it came open, and he started into the dwelling, whereupon the appellant fired, killing the deceased, and ran out, called to some one that he killed a man, and proceeded to start towards town at a rapid gait, and, meeting the officers who had been telephoned to come to the witness' residence to see about the drunken man, he asked them if they were officers, and they replied that they were, when the appellant said, "I reckon · the white folks will get me to-night." The officers asked him what he had done, and he stated he had killed a man; they asked him what for, and he stated the deceased was breaking in his house. He was carried back to the scene of the killing, and from there to jail. The officers found the deceased lying with his feet and part of his legs inside of the house, with his head and body out on the gallery, and stated that they saw no damage done to the door. The only eyewitness to the killing was a negro woman who was in the house at the time, by the name of Jazabelle Jones. The house where the killing occurred belonged to the mother of Jazabelle Jones, and the appellant took his meals there, but stayed at the house of Jazabelle Jones a short distance away. Jazabelle was at the time in her mother's house sick. She testified that appellant ran into the house with the milk, shut and locked the door, and that deceased came upon the gallery, ran against the door two or three times trying to enter the house, cursed the appellant for a vile name, and demanded that appellant open the door; that appellant stated he would not do so, that "this ain't no white folks' house;" the deceased went away, and returned in a few minutes repeating the epithets used toward appellant, demanding that the door be opened, ran against the door; and thereupon appellant picked up the shotgun, saying, "This ain't no white folks' house"; that the deceased ran against the door two or three times, and the door fell in, and appellant fired and killed deceased, and ran out, going toward town, and that she ran out also, running towards the residence of a white person near by. This woman, Jazabelle, was arrested and placed in jail

the same evening.  She was asked upon cross-examination
if she did not state to the officers that she told appellant
not to shoot the deceased; that he was drunk, and would
do him no harm.  She stated that she was so frightened
she did not know what she said, and in part of her evi-
dence said she did not say anything.  She would not, how-
ever, deny making the statement to the officers in answer
to questions.  In some statements she seemed to deny
making such statements.  These officers were introduced
in rebuttal to contradict her in this statement, and testified
that she did make such statement.  The state failed to in-
troduce this woman in its evidence in chief, and a motion
to strike the evidence and for a peremptory instruction
was made and overruled, whereupon the defendant intro-
duced said Jazabelle Jones, who testified as above set forth.
The defense objected to the questions and to the impeach-
ment of this witness.  The defendant sought at the close
of the case a peremptory instruction, which was refused,
and also instructions that the jury could not find the de-
fendant guilty of murder; also certain instructions that,
if the defendant was breaking in the house at the time of
the shooting, and the shooting was done either to prevent
it or immediately after the breaking in was made, it, at
most, would be only manslaughter; which instructions were
refused by the court.

At common law it was a misdemeanor to forcibly enter
a dwelling.  The rule is stated in Clark's Criminal Law
(1 Ed.) at page 345, as follows:

"Forcible entry and forcible detainer were crimes under
the old common law, and were also defined and declared
by early English statutes, which are the common law with
us.  To constitute a forcible entry, there must be more
force than is sufficient to make the entry a mere tres-
pass.  Some violence must be used, or rather some apparent
violence; for there may be no actual force, its place being
supplied by the presence of such a number of people as to
terrorize the occupants of the premises, or by menaces
and threats reasonably leading them to believe that bodily
injury will be done unless they give up the possession"—

citing Wharton's Criminal Law, section 1083; 2 Bish. Cr. Law, section 489, and a number of decisions.

The same authority, Mr. Clark, at page 142 of his Criminal Law, under the title "Defense of Habitation," says:

"A man's house is his castle, and he is never bound to retreat from it. He may stand his ground there, and kill a person to prevent his forcible and unlawful entry"— citing 1 Hale, P. C. 458; *Wright* v. *Com.,* 85 Ky. 123, 2 S. W. 904; *Pond* v. *People,* 8 Mich. 150, 177; *State* v. *Peacock,* 40 Ohio St. 333; *Corey* v. *People,* 45 Barb. (N. Y.) 262; *State* v. *Taylor,* 82 N. C. 554; *Carroll* v. *State,* 23 Ala. 28, 58 Am. Dec. 282; *Baker* v. *Com.,* 93 Ky., 302, 19 S. W. 975.

Section 1068, Code of 1906 (section 796, Hemingway's Code), reads as follows:

"Every person who shall be convicted of breaking and entering any dwelling house, in the day or night, with intent to commit a crime, shall be guilty of burglary, and be imprisoned in the penitentiary not more than ten years."

In section 1230, Code of 1906 (section 960, Hemingway's Code) reads as follows:

"The killing of a human being by the act, procurement, or omission of another shall be justifiable in the following cases: . . .

"(e) When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling house in which such person shall be.

"(f) When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished."

If at the time of the killing the deceased was attempting to break into the house where the appellant was unlawfully, and with the intent to commit a crime therein, he was guilty of a felony, and the killing was justifiable under clause (e) of section 1230, Code of 1906 (section 960, Hemingway's Code), and if the deceased intended, or if it

was reasonably apparent from the facts as they appeared to the deceased at the time, situated as he then was, that the deceased intended, to do appellant some great personal injury, and there appeared to be imminent danger of such design being accomplished, then the homicide was justifiable. I do not think the circumstances in evidence are such that any conclusion can be drawn from them in the situation that the appellant then was except that the deceased intended to do personal injury to the appellant. This is the only logical conclusion that could be drawn from the facts and circumstances as they appeared to the appellant at the time in his then environment. He had been chased to the house by this man, who used violent language toward him, and who, on his demand for admittance being refused, undertook to force his way into the dwelling. There was nothing to indicate any other fact, and any reasonable man under the circumstances would apprehend grave personal injury at the hand of the deceased if he was given admittance. The after-developed facts have no bearing on the situation. It is true the deceased was not armed with any deadly weapon, but the defendant had every reason to believe that he had gone away for the purpose of securing one, and that his intention was to inflict violence upon him. Under the circumstances no presumption of malice can arise from the use of a deadly weapon, and without such presumption there can be no conviction of any crime under the evidence in this case.

In *Ayers* v. *State,* 60 Miss. 709, Justice COOPER, speaking for this court, said:

"It cannot be said that a man on his own premises seeks a difficulty with a trespasser whom he attempts to evict therefrom, or to restrain from an unwarrantable injury to or control over his property. The accused, under the circumstances shown by the evidence, had the right in law to interpose by force to prevent the commission of the trespass by Boon; he was authorized to arm himself with whatever weapon he desired, and to use it to the extent of slaying the trespasser if it should become necessary, in

the progress of the difficulty, to protect his own life or person against a felonious assault. No man is required by law to yield possession of his property to the unlawful claim of another. He may defend his possession; and while he may not kill to prevent the trespass, he may kill to protect his own person against a deadly assault made by the trespasser on him. In other words, one who assaults a trespasser to prevent the injury threatened is the actor but not the aggressor in the difficulty, and he does not lose the right of self-defense because he makes the attack."

In *Maury* v. *State,* 68 Miss. 605, 9 So. 445, 24 Am. St. Rep. 291, it was held, in case where men went armed at night to the premises of the defendant, and entered his yard near a cotton house situated therein, and some one cried out "Here he is," and a movement was made toward the house, and defendant, with several friends, from their hiding place in the cotton house, opened fire on the invading party, killing two, that malice cannot be predicated upon such facts.

In *Long* v. *State,* 52 Miss. 23, the court announced the doctrine that, in trying persons for homicide, where the defense is killing in self-defense on the theory of apparent danger, in passing upon the action of a party who has slain another, the jury should not try him by the light of after-developed events, nor hold him to the same cool and correct judgment which they are able to form; they should put themselves in his place and judge of his acts by the facts and circumstances by which he was surrounded. The same rule applies to the court in passing upon the sufficiency of the evidence to sustain a conviction. It seems to me that the jury reached their verdict by considering the alleged statement made by Jazabelle Jones to the officers. This evidence was wholly incompetent to prove the guilt of the defendant. Its sole competency was to impeach or weaken the testimony of the witness, Jazabelle Jones. It had no tendency whatever to prove the guilt of the appellant.

In *Patty* v. *State* (Miss.), 88 So. 498, the rule was announced as follows:

"Where one is on trial for murder, he is presumed to be innocent until the contrary is made to appear; but if it be shown that he killed the deceased with a deadly weapon, the general presumption yields to the specific proof, and the law infers that the killing, if unexplained, is malicious, and therefore murder; but if the attendant circumstances and facts be shown in evidence, the character of the killing is determined by considering them. The lawfulness or unlawfulness of the killing are to be judged from the facts, and the presumption of malice from the use of a deadly weapon yields to the evidence, and will not support a conviction of murder against the facts showing justification."

The same doctrine was announced in *Hawthorne* v. *State,* 58 Miss. 778.

It was also held in the *Patty case, supra,* where eyewitnesses to a homicide can be obtained, they or some of them should be introduced by the state, and where the state fails to call eyewitnesses, and the defendant calls them, and they testify to the facts and circumstances of the killing, and its cause or origin, and such facts are not contradicted by witnesses or by circumstantial evidence of a conclusive character, and where the evidence for the defense shows justification for the killing, a conviction cannot be upheld on the mere presumption of law arising from the use of a deadly weapon.

In *Houston* v. *State,* 117 Miss. 311, 78 So. 182, it was held that in such case the facts and circumstances in evidence must contradict the testimony of the witness to the transaction before the jury can disregard such testimony. In the case before us the circumstances in evidence are all consistent with the testimony of Jazabelle Jones. The conclusion from the circumstances in no wise conflict with her statement of the facts. The circumstances are as consistent with her testimony as they are with the theory of the state. The facts adduced by the state show that the defendant was not seeking to escape, and contradict any theory of any willful or malicious intention. If he had intended to murder, and had been conscious of guilt, he

would not have sought the officers and made the statements that he made. He could just as easily have gone the other way and in all probability could have escaped. He would not have called out immediately after the shooting to attract attention to the fact that he had killed the deceased. The facts adduced by the state were not conclusive in their nature. They show, on the contrary, that the killing was not malicious or willful, but, on the contrary, was in defense of the habitation of the defendant. The conduct of the defendant is precisely the conduct of most men confronted exactly as he was. He was not required under the circumstances to let the deceased get on terms of equal preparedness with himself. To do so would be to gamble with the issues of life and death under such circumstances. All persons are entitled to the equal protection of the law, and to announce the rule that a man may not defend his home and himself against such unlawful and violent entry is to lay down a rule that will be breached oftener than observed even by the most peaceful and law-abiding citizen. I think the judgment should be reversed, and the appellant discharged.

ANDERSON, J., concurs in the foregoing dissent.