604 So.2d 243 (1992)
Mona Kianne LENTZ a/k/a Mona L. Morris a/k/a Mona Kianne Morris
v.
STATE of Mississippi.
No. 07-KA-59640.
Supreme Court of Mississippi.
June 10, 1992.
*244 Robert M. Ryan, Senatobia, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and PITTMAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:
On April 28th 1988, Mona Kianne Lentz was convicted in the Tate County Circuit Court of manslaughter for the fatal shooting of Christopher Wayne Hudspeth, her former boyfriend and father of her unborn child. On May 20th 1988, she was sentenced to eighteen (18) years confinement, with six (6) years suspended. Feeling aggrieved, she appeals and assigns three errors.
1. The Court erred in ruling that expert testimony concerning the Battered Women's Syndrome would not be admissible.
2. The Court erred in not appointing [an] expert witness.
3. The Court erred in refusing to allow into evidence the results of the drug screen analysis.
We have carefully reviewed the record of the proceedings and tragic facts of this case which involved a woman who, while admitting to killing the man who had repeatedly battered her, claimed she killed in self-defense. While we might wish for the power to make damaged souls whole, our duty is to review the proceedings conducted in the lower court to insure the defendant was fairly tried and afforded all of her constitutional rights. With this duty in mind, we find the first two assignments of error are without merit. Regarding the third assignment of error, we find that, while the circuit court erred in ruling the results of a drug screen analysis were inadmissible, the results were only peripherally relevant, and the evidence overwhelmingly supported the jury's verdict. Therefore, the error does not rise to a level requiring reversal of Lentz's conviction. Accordingly, *245 we affirm the judgment of the Circuit Court.

FACTS
Lentz met Hudspeth in June of 1986, and began living with him in August of that year. Lentz testified that during this relationship, Hudspeth repeatedly battered her. She briefly separated from him in March of 1987, but resumed the relationship in April or May of 1987, until July 10th 1987, when she and her children moved to the home of her second cousin.
On September 5th 1987, Lentz decided to take her own life. She left her cousin's house with her three children in the car and drove to a pawnshop where she purchased a .25 caliber automatic pistol. What prompted her decision to take her own life is not entirely clear; however, it appears she grew up in an atmosphere of domestic violence and verbal abuse; and, believing that her cousin was no longer willing to allow her to continue living in her home, was worried she could not provide food and shelter for herself and her three children.
After purchasing the pistol, Lentz drove, somewhat aimlessly, to her mother's home where she intended to leave her children. Her mother was not home, so she took her children to lunch for a treat of fast-food. She then went to visit a woman to whom she planned to give what little money she had, but found the woman did not need the money as much as she had believed. Then, she returned to her mother's house and was waiting for her mother to return when she saw Hudspeth drive by the house. Upon seeing Hudspeth, Lentz decided she wanted to talk with him one last time so that she would leave good memories of herself.
She drove to Hudspeth's house, where she and Hudspeth entered into a conversation, during which Hudspeth told her that he had smoked marijuana earlier that day. Further, Hudspeth asked her to come inside the house. When she declined, he became jealous and angry and went back inside the house. Shortly thereafter, Hudspeth's cousin came out of the house and talked briefly with Lentz before going to his father's house, which was next-door to Hudspeth's. Lentz did not want Hudspeth to remember their last moment together as one of strife, so she walked to his front door, where she was met by Hudspeth, and again they talked.
Deciding she no longer wished to kill herself, Lentz asked Hudspeth for her waterbed which she had left in his bedroom. They went inside the house to the bedroom, whereupon Hudspeth refused to return the bed to her. Lentz told him "you know what Judge Kopf said about you using my stuff." At the mention of Judge Kopf, Hudspeth's facial expression changed, and "his eyes turned black." From previous batterings, Lentz knew it was "[t]ime to get out, time to leave... . Get away." She tried to "ease out" of the house, but Hudspeth saw her and said, "[i]f I have to go to jail this time, if I have to go this time, it will be for a reason." Hudspeth grabbed her, pulled her back, and she fell. Lentz testified as follows:
[T]he next thing I remember is his back was to me. There was ringing. He was gone. And I thought, oh, my God, he's gone to get my girls. And then I thought, my girls, as I got to the door he had a pistol, himself, that he had used on me before. I did not see him with my girls. I thought he might be on the other side, maybe he got his pistol out of his car quick enough to shoot them because I had scared him. I felt I had scared him because he was not in the room.
Further, when asked on direct examination whether she remembered shooting Hudspeth, Lentz stated:
I remember thinking of the pistol when he knocked me down, to scare him so I could get away and then I heard the ringing and he wasn't there, so figured I had scared him or that he was either going to lock the door to really, so no one could get in. Because that's usually what he did. He usually went and locked all the doors where the girls could not get in when I was screaming.
Although she was afraid Hudspeth would be waiting for her outside the house, *246 she went outside where she saw him lying on the ground. She thought he was "playing," although she could hear someone breathing with difficulty, as if they had bronchitis.
Hudspeth's cousin testified that when Lentz arrived at Hudspeth's house, he left and walked next door to his father's house. Shortly thereafter, he heard a gunshot and ran outside where he saw Lentz running away with a gun and Hudspeth lying on the ground near the steps leading into his parents' house, which was approximately one hundred (100) feet from Hudspeth's house. The cousin's father also testified that he heard a shot and came outside where he saw Lentz running away and Hudspeth lying on the ground. The cousin's mother also testified that she saw a female running away, and Hudspeth on the ground.
An autopsy revealed that Hudspeth had been shot twice at close range with a .25 caliber pistol. Only one of the two wounds was fatal; the fatal bullet entered his back and passed through his heart, and another bullet entered his face, near his left cheek. According to expert medical testimony, it would not have been unusual for a person to have received a fatal wound, as was present here, and to travel a distance of one hundred (100) feet before collapsing.
Lentz testified that she drove from Hudspeth's house to her mother's house, where she left her children. Lentz's mother testified that Lentz told her that she had shot Hudspeth once and he had fallen down, and then she shot him again; however, Lentz stated she did not remember telling this to her mother. Lentz left her mother's house, driving somewhat aimlessly and telephoning both her mother and the cousin with whom she had lived, until she came upon a Sheriff's office patrol car, driven by a Deputy Sheriff, to whom she surrendered.

I.
In the first assignment of error, Hudspeth contends the Circuit Court erred in ruling an expert witness's testimony concerning the battered woman's syndrome was irrelevant and therefore inadmissible. Generally, expert witness testimony is admissible where it "will assist the trier of fact to understand the evidence or to determine a fact in issue... ." MRE 702. See also, Wilson v. State, 574 So.2d 1324, 1334 (Miss. 1990); Roberson v. State, 569 So.2d 691, 693 (Miss. 1990). Lentz sought to introduce the expert witness's testimony in order to show the killing of Hudspeth was done in self-defense. In May v. State, 460 So.2d 778 (Miss. 1984), we stated:
[W]hat has come to be known as the battered wife syndrome has important informational and explanatory power and is being accommodated by our law. It does not, however, supplant accountability. When a wife kills her husband under circumstances where, objectively speaking, it was not reasonably necessary that she do so in her own self-defense, she should not expect acquittal at the hands of our law, no matter how long she may have been a battered wife.
Id. at 785 (emphasis added).
Thus, we have not issued a blanket prohibition against the admission of testimony regarding the battered women's syndrome; however, we have held that whether a killing is justified upon grounds of self-defense is to be judged by objective standards, that is, a killing is justified if the person who kills did so under circumstances which would lead a reasonable person under similar circumstances to conclude she was in imminent danger of death or great bodily harm. Cook v. State, 467 So.2d 203, 207-208 (Miss. 1985) (construing MISS. CODE ANN. § 97-3-13(1)(f)). See also, Robinson v. State, 434 So.2d 206, 207 (Miss. 1983); Williams v. State, 127 Miss. 851, 852, 90 So. 705 (1921). Further, we have held that this reasonable person standard applies equally to cases in which battered women kill their abusers as it applies to all other types of cases in which killings take place. Buchanan v. State, 567 So.2d 194 (Miss. 1990); Mullins v. State, 493 So.2d 971, 975-976 (Miss. 1986); May 460 So.2d at 784. Therefore, the question of whether the circuit court erred in ruling the expert testimony was irrelevant is governed by whether expert testimony would *247 have aided the jury in understanding the facts of the case sub judice.
Turning to the facts of the case sub judice, we note Hudspeth was shot twice, with the fatal bullet entering his back. Further, two live rounds of ammunition and two expended shell casings were recovered at the scene of the shooting: one shell was found in Hudspeth's bedroom; a live round was found in the house in a hallway leading from the bedroom towards the front door; and both an expended shell as well as a live round were found where Hudspeth collapsed, outside the home of his relatives, which was approximately one hundred (100) feet from his home. Further, witnesses who sold the pistol to Lentz at the pawnshop testified she was unfamiliar with firearms, so they loaded the pistol for her and instructed her that in order for the pistol to fire with each pull of the trigger, it was necessary to chamber a round by pulling the top portion of the pistol back to release it. If this chambering procedure was repeated after a live round had already been chambered, a live round would be ejected from the pistol. Thus, it appears that Lentz shot Hudspeth while they were in the bedroom, and he left his house and attempted to go to his relative's house. Lentz apparently left the bedroom and went into the hallway where she chambered a live round from the pistol, and followed Hudspeth for one hundred feet to the steps of his relatives' house where she shot him again. Either before or after this second shot, she again ejected a live round from the pistol. Moreover, Lentz's mother testified her daughter told her she had shot Hudspeth once, and he fell down, after which she shot him again.
Upon these facts, the jury was charged with determining whether Lentz shot Hudspeth while reasonably believing she was in imminent danger of serious injury or death. We find that neither the evidence nor the issue of whether Lentz reacted as a reasonable person would in similar circumstances have been made clearer by expert testimony going to the battered women's syndrome. Therefore, the circuit court did not err in ruling the expert testimony to be irrelevant.

II.
In the second assignment of error, Lentz asserts the circuit court erred in not appointing, at State expense, an expert who would testify as to the battered women's syndrome. Having found the expert witness testimony was properly excluded, it is not necessary to address this assignment of error in detail. Nevertheless, we note that in a case where a defendant's sanity becomes "a significant factor at trial," the State must assure the defendant access to a psychiatrist who will assist the defense in its presentation of evidence. Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). See also, Pinkney v. State, 538 So.2d 329, 343 (Miss. 1988) (vacated on other grounds at 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931). However, generally, the State is not required to furnish funds for an indigent defendant to obtain expert testimony or independent investigation. Pinkney at 343-344 (private investigator); Billiot v. State, 454 So.2d 445, 453 (Miss. 1984) (investigator to determine mood and attitude of community toward defendant); Love v. State, 441 So.2d 1353, 1356 (Miss. 1983) (independent analysis of illegal substance); Bullock v. State, 391 So.2d 601, 607 (Miss. 1981) (criminologist and/or criminal investigator); Davis v. State, 374 So.2d 1293, 1297 (Miss. 1979) (handwriting expert); Laughter v. State, 235 So.2d 468, 472 (Miss. 1970) (private investigator). In the case sub judice, Lentz was examined by personnel at the Mississippi State Hospital in Whitfield, and therefore was afforded her constitutional rights in regard to her state of mind and competency to stand trial. There is no merit to this assignment of error.

III.
In the third assignment of error, Lentz asserts that the circuit court erred in ruling a report of a drug analysis performed on Hudspeth's remains was inadmissible. The circumstances which led to *248 the circuit court's ruling were peculiar. Four months prior to trial, the circuit court issued an order, which granted Lentz's motion for a drug analysis, stating:
ORDERED AND ADJUDGED that the appropriate personnel at the Mississippi State Crime Laboratory in Jackson, Mississippi, be and are hereby ordered and directed to perform any and all such additional testing of the evidence samples under its care, custody and control that have been taken and received in this cause for the purpose of determining whether or not there are any indications of marijuana present in any such evidence samples, and thereafter, forward the results of any such tests to the Court, the District Attorney and defense counsel.
However, rather than performing the test of Hudspeth's body for traces of marijuana, the Mississippi Crime Laboratory sent urine samples taken from Hudspeth's body to a "Smith Kline Bioscience Laboratory" in Alabama, and the test was performed there, where it was determined that Hudspeth did have traces of marijuana in his urine. Thus, the test was conducted by a person or persons who did not reside in Mississippi. At trial, Lentz sought to introduce a report of the test findings via the testimony of an employee of the Mississippi Crime Laboratory who received the report from the Alabama Laboratory. However, the circuit court ruled this testimony constituted hearsay, as the Mississippi Crime Laboratory employee did not have first hand knowledge of the report's preparation.
The circuit court erred in making this ruling, because the report was prepared by the Alabama Crime Laboratory for the Mississippi Crime Laboratory in the course of both laboratories' regularly conducted activity. A report made in the regular scope of business is not hearsay under MRE 803(6), which provides in part:
[a] memorandum, report, record or data compilation, in any form, or acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
The comments to this rule indicate:
It is important to note that the custodian as well as other qualified witnesses may testify. Thus, it is not necessary to call or to account for all participants who made the record.
However, the source of the material must be an informant with knowledge who is acting in the course of the regularly conducted activity. This is exemplified by the leading case of Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930), which is still the applicable law today under the rule. That case held that a police report which contained information obtained from a bystander was inadmissible; the officer qualified as one acting in the regular course of a business, but the informant did not.
In Copeland v. City of Jackson, 548 So.2d 970 (Miss. 1989), we held that a traffic accident report prepared by a police officer acting within the regular scope of his duties was admissible under MRE 803(6) through the sponsoring testimony of the police officer's superior. Id. at 975. Thus, where a law enforcement agency prepares a report as a regular exercise of its duty, the report is admissible under MRE 803(6), so long as the person who is the source of the information contained in the report was acting in the regular exercise of the agency's duty when he learned of the information. See Minnick v. State, 551 So.2d 77, 89 (Miss. 1988) (reversed on other grounds at 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489).
In the case sub judice, the person who performed the test at the Alabama laboratory was acting within that laboratory's regular scope of business at the instruction of the Mississippi Crime Laboratory. Consequently, the report was admissible under MRE 803(6). Further, the sponsoring witness *249 of the report could be an employee of the Mississippi Crime Laboratory who acted as the record's custodian. The circuit court erred in not allowing the report to be admitted into evidence.[1]
Even where error has occurred, we will not reverse a conviction when the overwhelming weight of the evidence supports the guilty verdict. Holland v. State, 587 So.2d 848, 865 (Miss. 1991); Whitley v. State, 511 So.2d 929, 931 (Miss. 1987); Griffin v. State, 504 So.2d 186, 190 (Miss. 1987); Giles v. State, 501 So.2d 406, 408 (Miss. 1987). In the case sub judice, the evidence overwhelmingly supported the jury's rejection of Lentz's claim that she killed in self-defense. On the day the killing occurred, Lentz purchased the gun used to shoot Hudspeth and drove to his house, which she voluntarily entered. Further, after shooting Hudspeth once, she followed him to the porch next door, approximately one hundred (100) feet, where she shot him again. Moreover, the fatal wound was a gunshot to Hudspeth's back, and it appeared that she repeatedly cocked the pistol and chambered two live rounds into the pistol's firing chamber. Additionally, an employee of the Mississippi Crime Laboratory testified outside the jury's hearing that the test results could only show that Hudspeth had used marijuana at some time during the week before he died, and the jury heard Lentz's testimony that Hudspeth said he had smoked marijuana on the day of his death. Therefore, it would strain one's imagination to find that the admission of the drug analysis showing that Hudspeth's urine contained traces of marijuana would change the verdict of the jury in this case.

CONCLUSION
Because the circuit court correctly excluded expert witness testimony regarding the battered women's syndrome, and because the overwhelming weight of the evidence supported the jury's rejection of Lentz's theory of self-defense, we affirm Lentz's conviction of manslaughter.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] When the State seeks to introduce a report of a scientific analysis against a defendant, the defendant's sixth amendment right to confrontation requires that he be allowed to cross-exam the person who conducted the analysis. Barnette v. State, 481 So.2d 788, 790-791 (Miss. 1985). While this right was not at issue in the case sub judice, we nevertheless note that the State had four months notice that Hudspeth's remains would be tested for marijuana.