## FLETCHER v. STATE.

[91 South. 338. In Banc. No. 22229.]

HOMICIDE. *Killing held to amount to no more than manslaughter, where defendant was resisting unlawful act.*

Where the deceased, after directing the defendant to do an act, undertakes to take from the defendant unlawfully a gun with which the defendant is armed, and in order to secure the gun draws, or attempts to draw, a pistol, and is shot by the defendant in resisting such unlawful act, a conviction of murder will be set aside. At most, such killing will not amount to more than manslaughter.

SMITH, C. J., dissenting.

APPEAL from circuit court of Bolivar county.
HON. W. A. ALCORN, JR., Judge.

Lewis Fletcher was convicted of murder, and he appeals. Reversed and remanded, for new trial.

*D. E. Beams* and *J. C. Walker,* for appellant.

Instruction No. twelve requested for defendant should have been given, because the state had wholly failed to meet the burden of proving the crime of murder in any of its constituent elements save the mere fact of the killing. Self-defense was the defense interposed by this appellant, and we humbly submit that the defense is amply supported by the testimony of all the witnesses, especially state's witnesses Johnson and Lee, and the physical facts in this case, which are not susceptible of change.

Where there is nothing in the evidence to connect the defendant with the killing except her own testimony, showing she acted in self defense, after being assaulted with a knife, by deceased, which is not contradicted by physical facts, or inconsistent circumstances, but rather corrobo-

rated by state's witnesses, the state has failed to prove defendant's guilt beyond a reasonable doubt and refusal of a peremptory instruction was error.

In the case at bar, as in the Houston case, *supra,* there would be no proof as to the actual firing of the first shot, except for the testimony of the defendant, himself.

Could it be seriously argued, in the light of these facts, that this appellant hadn't the right to protect himself, in the way in which he did? We hardly think so; And finding himself in the predicament that he then found himself, at the disadvantage at which he found himself, wouldn't the last two shots have been justified, even if it had been shown that either, or both of them took effect? To answer these propositions in the negative, would in effect completely wipe out the right of self defense, and say that under no circumstances would a person so threatened, be warranted or justified in resorting to the extremest measure to protect his life. If there was ever a case of justifiable homicide, this is one, and we venture the assertion that if it had been two white men, or two negroes, that this case would never have gone beyond the preliminary stage, and that the survivor would have been declared to have acted within his rights and permitted to go free on the showing made by the state.

In the foregoing view of the case at bar, if it was error to deny the peremptory instruction requested for the defendant, manifestly, it was error to deny the motion of the defendant for a new trial and in rendering the judgment on the verdict.

*D. C. Enochs,* assistant attorney-general, for the state.

The appellant complains that the trial court erred in refusing to grant him a peremptory instruction.

There is a great deal of conflict in the testimony in the case as to who was the aggressor, the appellant or the deceased.

The deceased, Mr. T. C. Bullock, the assistant manager, died a violent death, and Mr. Brown, the manager, died a

natural death, and therefore the court has not the benefit
of the testimony that these two men could have given the
court in reference to the settlement between them and the
appellant.   But it is inescapable, in view of the fact that
the appellant went down there on the following morning
after his removal, with a shot-gun, that the appellant was
on the war path.   The appellant offers no explanation as
to why he carried the gun.   He does not state that he in-
tended to hunt squirrels or birds on the way.   And the only
purpose for which he carried it, so far as the record dis-
closes, was the use he made of it.   He does not state, as an
excuse for carrying the gun, that he anticipated trouble
with the deceased or any other person if he went back down
there, but on the contrary swears that satisfactory and
pleasant relations existed between him and the deceased
prior to that morning.   Indeed, he would have the jury
believe that the deceased having the most cordial feelings
for him, was attempting to shoot him to death at the time
that he shot and killed the deceased.   His explanation as
to how the difficulty arose which justified him as he con-
tends in the slaying of the deceased, is to my mind unrea-
sonable.   It isn't reasonable that the deceased, feeling to-
ward the appellant as the appellant himself swears, would
have attempted to shoot the appellant without cause.

I have not undertaken to set out the testimony in this
case because it is conflicting, and because in order to prop-
erly weigh it, all of it must be read and considered by the
court as a whole.   And I think that when all the evidence
is considered in the case, no error was committed by the
trial court in refusing a peremptory instruction in favor
of the appellant.   It is not shown that the deceased was an
overbearing man, and it is sworn to by the appellant him-
self that there was no illwill existing between him and the
deceased.   The appellant would have the court believe
that the deceased undertook to shoot him without provoca-
tion.   He does not offer any reason why the deceased would
make an attack upon him.   He is as silent in reference
to any motive on the part of the deceased to make an at-

tack upon him, as he is silent on the motive why he had his gun on the occasion in question. Of course, as I have said, death has sealed the lips of the two managers of the plantation, who could have given the court the facts in reference to the feeling of the appellant toward them in reference to the settlement. But it sufficiently appears that the settlement was not satisfactory to appellant, not only because he carried his gun down there the next morning, but because he refused to go up to the house to see the manager, but demanded if the manager desired to talk to him he would have to come out to where he was. I respectfully submit that the case was one for the jury.

I therefore respectfully submit that the case should be affirmed.

ETHRIDGE, J., delivered the opinion of the court.

The appellant was convicted of the murder of T. C. Bullock, sentenced to suffer death, and from said judgment appeals.

The deceased, Bullock, was an assistant manager on the "Neblett" or "Virginia" plantation, said plantation being known by both names. The killing occurred in the latter part of December, 1920. Fletcher had been a tenant upon the premises, and had removed from the premises, the evening before the killing. On the morning of the killing he had gone back to the place where the manager lived, near which was a blacksmith shop. At the blacksmith shop he met Mr. Bullock, and some conversation occurred, in which Mr. Bullock asked Fletcher where Fletcher's wife was, and he told him that he had moved her to her uncle's as he told him he was going to do. Mr. Bullock asked the defendant to go to the house and see Mr. Brown, the manager. According to the state's witnesses, Fletcher replied that he would not go to the house, and, if Mr. Brown wanted to see him, that he would have to come out there. Bullock directed him to go on to the house, which the defendant refused to do. The defendant rode up to a boy named Shed Lee, and asked him for the makings of a cigarette.

The main state witness turned away, and was doing some work in the shop when he heard Mr. Bullock say, "Give me that gun," and almost immediately heard shooting. He then ran out, and saw the deceased running away from the defendant, and the defendant shooting at him. The deceased ran about 120 feet, and fell, and when he fell had his pistol in his right hand. In the first part of his testimony this witness said that he heard no shooting except the shotgun, but on cross-examination stated that he heard a pistol shot, and that he could tell the difference between the pistol shot and the gunshot. After Bullock fell the defendant ran away, and was captured in Texas, and returned without requisition to Mississippi for trial.

The witness Lee was an eyewitness, but seemed to have been badly frightened. He said that he saw Mr. Bullock approach towards where the defendant was sitting on his mule, the defendant having a shotgun resting on his thigh, the gun standing up, and had his arm around the gun, rolling a cigarette. That Mr. Bullock had his right hand in his coat pocket, and with his left hand reached up and demanded of the defendant that he give him his gun. The defendant fell from the mule, and fired at the deceased, Bullock. This witness could not state whether he heard a pistol shot or not, but claims to have seen the transaction until the shooting ceased, when he ran away. He said at the time of the shooting he could not see Mr. Bullock's hand, and could not say whether Bullock shot, or, if he shot, whether he shot first or whether the defendant shot first.

The mule on which the defendant was sitting was shot through the neck with a pistol bullet. The bullet entered the mule's neck about halfway between the head and shoulders, and ranged upward and in the direction of the body of the mule, and made its exit about three-quarters of an inch below the mane on the opposite side.

After Bullock fell his wife came out and took the pistol. The body of Bullock was carried into the house, and the

wound examined by a physician and others. When he was examined by the physician he was dead. The wound was in the right arm, was a lacerated wound, and evidently made at close quarters. The muscle on the front of the arm was badly lacerated, thus torn into mincemeat. There were no punctured wounds in the chest. The wounds were made near the shoulder or armpit. The doctor testified that the wound inflicted would prevent him from lifting that arm; that he would practically have no power to lift the arm. The bone was not broken, and the doctor testified that it was possible for him to have fired a pistol, but that he could not lift his arm from the elbow; that he could have flexed his wrist. He said that the wound was not necessarily fatal, but that the deceased could have died from hemorrhage in a few minutes.

The state did not introduce the widow of the deceased, nor did it produce any witness who testified as to the condition of the pistol of the deceased, nor how many times it had been fired.

The defendant introduced a woman named Sarah McLemore, who claimed to have been at the commissary in plain view of the killing. She testified that Mr. Bullock made the first shot; that he made one shot, and Fletcher made the next one; that Fletcher was on his knees when he fired the shot; that she saw Mr. Bullock pull the pistol out of his pocket, but that she did not know which hand he used; that when Bullock shot, Fletcher fell to his knees, and came up under the mule's neck and shot Mr. Bullock, but there were more than two shots fired.

The defendant testified in his own behalf, and said:

That on or about the 29th of December, 1920, he had moved, and had turned some things over to Mr. Brown, and that Mr. Bullock came down the road that morning and met this wagon, and rode with the wagon until he could turn at Three Bridges going up to the house. That when he got to those bridges he got down on the bridge, and stayed there until they got a pretty good distance, and then rode on to the shop ahead of the defendant. That

the defendant was in sight of him when he got to the shop, and that, when he got down off his horse, and turned his horse loose, and when the defendant got even with the shop, Bullock called to him, "Lewis come here." That the defendant said, "Good morning, Mr. Bullock," and Bullock says, "Good morning," and says, " 'Lewis, where did you move to?' I says, 'I moved up to Scottland, on Mr. Scott's plantation.' He said, 'Who moved you?' I said, 'I had one of the tenant wagons on Mr. Scott's plantation.' He said, 'Whose mule is that you are riding now?' and says, 'Mr. Brown wants to see you.' I says, 'Well, Mr. Bullock, would you mind going into the house to see what Mr. Brown wanted?' He says, 'You go over there;' he says, 'He is in his room.' And that time I rode right on off from him, and he was talking to Shed Lee, and when I turned around, as soon as he got through talking to Mr. Shed, I says, 'Shed, give me a cigarette.' He said, 'Sure; I have got it.' And after that he gave me the tobacco, and I was pouring the tobacco out. I saw Mr. Bullock right in front of me like that, and all at once I heard Mr. Bullock say, 'I want that gun you got.' That struck my attention. I looked down at him, and I seen his face all frowned up, and when he said that he was coming out of his pocket with an automatic pistol, and I fell off the mule backwards, and when I hit the ground, Mr. Bullock fired, and I was lying on my back, and I shot up under the mule's neck, and Mr. Bullock shot at me, like that (indicating), and when he shot that time the mule ran, and I was getting up on the ground, and I shot as I got up, like that, and that time Mr. Bullock made about two steps kind of angling from me, and he throwed his sight like that, when he shot at an angle from me, and when he made that shot I saw his pistol fall out of his hand, and he slapped both hands together, and that time I heard the screen door make a racket, and then I seen Mr. Brown coming out of the house, and I broke and ran. Mr. Brown, he shot at me six or seven times, as near as I could get at it."

The defendant further testified that he had had a partial settlement with Mr. Brown, the manager, the day before, and had turned back part of his household stuff which had been furnished him, but that there had not been a complete .settlement. He further testified that he had gone over that morning to have a final settlement with Mr. Brown; that the gun he had was loaded with six shells, one in the chamber and five in the magazine; that it was loaded with No. 6 bird shot.

The defendant at the close of the evidence requested instructions in the following language:

"No. 11. We, the jury, find the defendant guilty of manslaughter"—which was refused by the court.

"No. 12. The Court instructs the jury to acquit the defendant"—which was refused.

The state got one instruction, which read as follows:

"The court instructs the jury for the state that, if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, Lewis Fletcher, willfully, feloniously, and of his malice aforethought killed and murdered the deceased, T. C. Bullock, as charged in the indictment in this case, then you will find the defendant guilty as charged, and your verdict will be in either of the following forms, to wit: 'We, the jury, find the defendant guilty as charged.' If this is the form of the verdict returned, the court will sentence the defendant to be hanged. Or, second, 'We, the jury, find the defendant guilty as charged, and fix his punishment at imprisonment in the penitentiary for life.' If this is the form of the verdict returned, the court will sentence the defendant to imprisonment in the state penitentiary for life. Or, third, if the jury all agree that the defendant is guilty as charged, but cannot agree as to his punishment, you will not hang the jury for this reason, but should return into court the following verdict: 'We, the jury, find the defendant guilty as charged, but disagree as to his punishment.' If this is the form of the verdict returned, the court will sentence the defendant to imprisonment in the state penitentiary for life."

The defendant secured ten instructions. None of the given instructions dealt with the law of manslaughter.

We have carefully considered the evidence, and, giving the evidence the most favorable construction for the state, the killing would amount to no more than manslaughter. The evidence fails to show any previous difficulty, and it appears clearly that the deceased was undertaking to disarm the defendant which he had no right to do. The shooting, according to the chief state witness, was so close together that it was difficult to distinguish between the shots. Undisputably the deceased shot the pistol at least one time, the bullet going through the neck of the mule upon which the defendant was sitting at the time he was undertaking to take his gun from him. The deceased had ordered the defendant to go to the house, and the defendant had refused to do so. The shot which killed the deceased evidently paralyzed his arm for the time being, and rendered him incapable of firing further shots. The shots fired at the deceased after he was shot in the arm clearly did not strike him.

The other state witness, who seems to have been badly frightened, could not tell whether the deceased or the defendant fired first. The shots were so close together as to make it almost simultaneous.

The other eyewitnesses for the defendant and the defendant himself say the deceased fired first. It was important in this attitude of the case to know how many shots had been fired from the pistol, and there is no showing in the record as to why the state did not produce this evidence. Mr. Brown, the manager, had died, and his testimony was not available to either party. The widow of Bullock took the pistol from the dead man, and she was not introduced, nor was the pistol introduced nor any evidence to show its condition.

It is apparent from the record that the deceased was attempting to disarm the defendant. This he had no right to do. It was held in *Cryer* v. *State,* 71 Miss. 467, 14 South. 261, 42 Am. St. Rep. 473, that, where one kills another, not

in malice, but to prevent an unlawful arrest of himself by such other, he is guilty of manslaughter, and not of murder. See, also, *Williams* v. *State,* 121 Miss. 433, 84 South. 8, and also 120 Miss. 604, 82 South. 318.

Our statutes classify the killing of human beings into murder, justifiable homicide, excusable homicide, and manslaughter, going into various phases in these statutory definitions, and in a general section at the close of this enumeration (section 1244, Code of 1906 [section 974, Hemingway's Code]) provides every other killing of a human being by the act, procurement or culpable negligence of another, and without authority of law not provided for in this chapter, shall be manslaughter.

It is doubtful if the defendant's theory of the killing is contradicted by the fact and circumstances in evidence, but, giving the state the benefit of everything that the evidence tends to prove, the killing could not amount to more than manslaughter.

The judgment will therefore be reversed, and the cause remanded for trial on this issue.

*Reversed and remanded.*

SYKES, J., took no part in the decision of this case.

SMITH, C. J., dissents.

SMITH, C. J. (dissenting). I am of the opinion that the evidence, my conception of which is somewhat different from that set out in the majority opinion, will support a verdict for murder, and that consequently the judgment of the court below should be affirmed.