RICHARDSON *v.* STATE.*

[121 So. 284. No. 27628.]

(En Banc. March 25, 1929. Suggestion of Error Overruled April 15, 1929.)

*Corpus Juris-Cyc References: Criminal Law, 16CJ, section 316, p. 210, n. 35; section 2190, p. 870, n. 65; 17CJ, section 3597, p. 270, n. 10; section 3679, p. 333, n. 95; Homicide 30CJ, section 570, p. 322, n. 65; section 659, p. 414, n. 79.

*M. T. Nailling* and *Mize & Mize & Thompson,* for appellant.

*J. A. Lauderdale,* Assistant Attorney-General, for the state.

McGowen, J. Silas Richardson, the appellant, was tried and convicted by a jury at the regular September.

1928, term of the circuit court of Hancock county for the crime of murder, and sentenced by the court to suffer the death penalty, and appeals to this court.

The appellant was convicted in the court below of the murder of John Damberino. The shooting affray occurred in the city jail at Bay St. Louis in said county, and the essential facts are as follows: Mark Oliver, the chief of police of that city, on the morning of August 14, 1928, arrested the appellant without a warrant on a charge of stealing an automobile of greater value than twenty-five dollars; after being arrested he was lodged in the city jail a little more than two hours; later Oliver, accompanied by Damberino, the deceased, went to the jail for the purpose of procuring from the appellant the key to the automobile charged to have been stolen. From the entrance to the jail there was a door opening into the corridor, or "bull pen;" to the left of the corridor from the front door there were three cells, each of which had a door opening from the corridor into the cell proper. The appellant was in the corridor or "bull pen." Oliver testified that he left the deceased, Damberino, at the door which permitted entrance into the corridor and went into the corridor for the purpose of getting the key to the automobile, telling the appellant that he wanted the key. Thereupon the appellant tendered to the chief of police a penknife and some money, telling him that was all he had. The officer advanced toward him for the purpose of searching for the key, whereupon the appellant retreated to the rear cell. The chief of police followed him into the cell, where the shooting occurred. The officer had upon his arm, attached thereto, what is commonly called a "billy," and upon his entering the cell he undertook to catch hold of the appellant, when the appellant presented a forty-five Colt pistol directly at him. According to the officer the pistol in the hands of the appellant was discharged directly at him in the narrow compass of the cell three times. The first shot was discharged in the

front of the officer's cap, which he had on his head; the second shot, we gather from the record, was a graze, and the bullet struck the back of the officer's head or neck and knocked him to the floor; while the officer was in a prostrate position the appellant discharged his pistol directly at him, and the third bullet took effect in the shoulder of the officer. The officer testified that he did not strike or attempt to strike the appellant with his "billy," and that he did not discharge his pistol while in the cell. The officer said that after the appellant left the cell door and was on the outside of the cell he discharged his pistol the fourth time, and that this fourth shot discharged by the appellant killed Damberino. The officer immediately got upon his feet, rushed out of the cell in pursuit of the appellant, and when he got out of the cell door he saw the body of Damberino lying prostrate on the floor with his head on his arm, and that while standing at the feet of the deceased he, the officer, discharged his pistol for the first time directly at the fleeing appellant as he was making his escape from the "bull pen" door.

The officer further testified that as he started from the place where he fired the shot he kicked the body of Damberino with his foot and concluded that he was dead. There was a diagram of the cell drawn by the officer which accounted for each pistol shot fired while in the cell, and demonstrated that it was impossible for any of the bullets discharged by the appellant, while shooting within the confines of the cell, to have found lodgment in the body of Damberino. He testified positively that Richardson fired four shots, three within the cell and one in the corridor after he had left the cell, or outside of the cell. The officer said he did not see the shot fired outside, but heard it. Damberino's body was lying outside of the cell.

Lionel Vickery, a witness for the state, fifteen years old, testified that he was at the city jail when Damberino

was killed. He had been there about five minutes talking to the appellant through the bars, the appellant being outside of the cage, the witness being in the hall. He testified that Damberino came there with the officer; that he did not hear Damberino say anything; that the officer Oliver, went into the cell, and after that he saw Damberino standing in the door leading into the cells, that is, the door from the city hall that goes into the hallway; that he heard three shots fired inside the cell and two shots on the outside of the cell, and he was positive as to the number fired outside the cell. He saw Damberino falling, did not actually see the shot fired, but saw Richardson lowering his smoking gun, which was pointed toward Damberino, and Damberino was going toward the cell where the shooting was going on. He saw the appellant step over Damberino's body after it fell and run out. He then saw Oliver fire at Silas Richardson as he was running out of the door which leads into the building, and at the time Oliver discharged his pistol Damberino was lying in front of Oliver on the floor. This witness further said that he "saw Oliver pull out his 'billy' as he was kinder in the cell door;" that he said to another boy who was with him, "Watch Oliver hit him with his 'billy.'" He did not see Oliver strike at appellant.

John Demoren was a boy sixteen years old standing with the Vickery boy and heard the conversation as to the officer searching the appellant and saw the appellant run back into the cell. He ran and laid down on the floor, was not positive as to the number of shots fired, and saw Richardson as he was going out of the door, and heard Oliver shoot.

It was further shown that the sheriff organized a posse of three hundred men, and it was some weeks later when the appellant was arrested. The state rested its case; the jury was retired, and the appellant made a motion to exclude the testimony, when the court called

attention to the fact that he did not understand that the evidence showed up to that time that Damberino had been shot and that the shot killed him. After some colloquy, the appellant and his counsel insisting on his motion, the court declined to entertain his motion, and permitted the state to reopen the case, and called the witness, who testified that he went immediately to where the deceased was lying and found a bullet wound above his eyebrow with his brains oozing therefrom and a large pool of blood, and as he made the examination the dedeased breathed his last and died in the presence of the witness, and that the wound caused his death.

The appellant strenuously objected to the recalling of the witness Traub and based his objection upon the ground that the state had rested its case, and he had made his motion to exclude. The colloquy between the court and counsel took place out of hearing of the jury.

The appellant's testimony was to the effect that when he saw the officers were going to search him he produced a pocketknife and money and told them that was all he had, but at the time he, the appellant, had concealed on his person a pistol; that he ran from the officer back into the cell in order to hide his pistol. He testified that as he went into the cell the officer came at him with a blackjack, which he ducked, and then, to use his own language, said: "After I ran from him, I tried to pull the gun out to try to hide it, and him tussling with me, and I was still trying to hide the gun under the bunk, and it was a double action gun and went off to shooting, and I ran out not knowing anybody was shot." He said further that all the shots he fired were in the cell; that Damberino was lying on the floor when he went out, and he ran away. He finally testified that the officer struck at him only once, and that because there was a bunk between them the officer could not catch hold of him, and that when he was trying to get the gun out it went off, and that as he pulled it up it was shooting. He had the gun

in his bosom. All the time he insisted that when he pulled the gun out it went to shooting. The appellant further said that he did not know how many shots were discharged from the pistol and did not know how many empty and loaded shells remained in the gun. He said that the officer was in the position of getting his gun when appellant's gun commenced to shoot. He said his gun was pointing straight at the officer, and that he, appellant, was frightened, and he was not shooting to kill anybody. His entire evidence was to the effect that the shooting of the pistol was accidental, and that he was not discharging the pistol in an effort to shoot anybody, but it went off as he pulled it out of his bosom.

Relative to the several motions it will be necessary for us to quote certain other bits of testimony with reference thereto. First, it is insisted that the court below erred in refusing to grant the appellant a change of venue on the two motions made by him. He first made a motion with the necessary affidavit accompanying for a change of venue before the trial began. On this motion the state offered six witnesses, who testified that they thought the case could be tried fairly and impartially in that county after it had been given some newspaper notoriety, and on cross-examination they said that the case had not been prejudged by the people of that county. The appellant called several witnesses who agreed with the state. Critically examined, the testimony of these witnesses showed that the case had not been prejudged by the people of the county.

After the jury was impaneled, the motion was renewed upon the ground that the examination of the jury on their *voir dire,* together with the other testimony, showed that the appellant could not have a fair trial in Hancock county. On the first motion for a change of venue the witnesses were all agreed that a fair and impartial jury could be had in the county, and a great many of them said that the case had not been prejudged. There was

no conflict in the testimony, and this court has held that where there is a conflict, and the testimony reasonably tends to show that the case has not been prejudged this court will not disturb the verdict. *Regan* v. *State,* 87 Miss. 422, 39 So. 1002; *Long* v. *State,* 133 Miss. 33, 96 So. 740; *Mackie* v. *State,* 138 Miss. 740, 103 So. 379; *Wallace* v. *State,* 143 Miss. 438, 108 So. 810; *Cummins* v. *State,* 144 Miss. 634, 110 So. 206.

On the second motion it is shown that the court examined forty men, a special venire, and from that number the jury was impaneled. The *voir dire* examination of the twelve men who actually sat as the jury disclosed that they were fair and impartial; of the other twenty-eight men the court excused nine because they had formed an express opinion; he excused three because they testified that they were related by blood or marriage to the deceased, and one because he said he could not give a negro a fair trial when he was charged with murder in the killing of a white man. The state exercised five peremptory challenges, and the appellant exercised ten. We do not think this analysis of the examination of the entire venire, where the appellant has not exhausted even his peremptory challenges, tends to disclose a prejudgment of the case so that the appellant did not have a fair and impartial trial. The jury was fair and impartial, because the appellant accepted it without objection and without exhausting his peremptory challenges, so that we do not think there was error in overruling the motion for a change of venue.

. Second, we content ourselves with saying that we do not see anything improper in the conduct of the trial court in permitting the case to be reopened for the purpose of showing that the deceased came to his death as a result of a bullet wound. *State* v. *Martin,* 102 Miss. 165, 59 So. 7; *Baird* v. *State,* 146 Miss. 547, 112 So. 705; *Morris* v. *State,* 148 Miss. 680, 114 So. 750.

Third, the appellant was not entitled to a peremptory instruction in this case, for if the evidence of the state believed by the jury, a case of murder was made out. Their main objection seems to be that Oliver is uncorroborated, and that the appellant contradicts some of the other testimony.

Fourth, it is contended that the court erred in permitting the case to go to the jury on the sole theory of murder or nothing, and assignment of error is based on the instruction on the form of the verdict, and the pertinent part is in this language: "The court instructs the jury on behalf of the state that if they find the defendant guilty of murder they may return into open court either of the following verdicts, to-wit." The crime of manslaughter was not defined or mentioned, but the balance of the instruction referred to the punishment for the crime of murder in the usual form. The language quoted did not deprive the jury of a right, if they saw fit to do so, to convict the appellant of manslaughter, and this instruction was approved by this court in the cases of *Tatum* v. *State,* 142 Miss. 110, 107 So. 418, and *Grady* v. *State,* 144 Miss. 778, 110 So. 225.

Fifth, it is insisted that the court should have granted three refused instructions, Nos. 3, 10 and 11, which are as follows:

"The court instructs the jury for the defendant that if you believe from the evidence that the defendant, Silas Richardson, unnecessarily killed the deceased, John Damberino, while resisting an attempt by Mark Oliver, the officer, to commit a felony, or to do any unlawful act, or after such attempt on Oliver's part had failed, you can only find him guilty of manslaughter."

And: "The court instructs the jury for the defendant that if you believe from the evidence that the defendant, Silas Richardson, unnecessarily killed the deceased, John Damberino, while resisting an attempt on the part of the officer, Mark Oliver, to strike him with his police-

man's club or 'billy,' or to do any unlawful act, or after such attempt had failed, you cannot find him guilty of murder but such an offense would be manslaughter.''

And instruction No. 3: ''The court instructs the jury that if you believe from the evidence that the defendant unnecessarily killed the deceased while resisting an attempt on the part of Mark Oliver and deceased to unlawfully search defendant then you are to find the defendant guilty of only manslaughter.''

In this connection it is proper to state that the court excluded evidence of the officer, Mark Oliver, on cross-examination, which showed that he arrested the appellant without a warrant and placed him in jail and allowed him to remain there for two hours and was proceeding to search him without ever having preferred a charge against him before a proper officer, and that he had arrested him and placed him in jail at the instance of the owner of the automobile alleged to have been stolen. In other words, the evidence tended to show that the arrest was unlawful and the search of the appellant in consequence of said unlawful arrest was itself unlawful. Counsel says that if the appellant killed the deceased unnecessarily while resisting an unlawful search the deceased would only be guilty of manslaughter. Hemingway's Code of 1927, section 1265 (Code of 1906, section 1447) defines what arrests may be made by an officer without a warrant. An officer may arrest any person without warrant for an indictable offense committed, or breach of the peace threatened in his presence, or when a person has committed a felony, though not in his presence, or when he has reasonable ground to suspect and believe the person proposed to be arrested did commit it, or upon a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested. The evidence is very unsatisfactory as to what grounds the officer had to suspect that the appellant had stolen the automobile.

Section 1016 of Hemingway's Code of 1927 (section 1237, Code of 1906) is as follows: ''Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter.''

We construe the above-quoted instructions as being based upon the above statute, and if we concede that the arrest was unlawful and that the search was unlawful, still we are of the opinion that the court did not commit error in refusing these instructions. A close scrutiny of the appellant's testimony reveals the clear fact that he based his entire defense to this case upon a statement that the pistol was double action and automatic and was discharged without his design—in other words, that the shooting on the part of the appellant was purely accidental and unintentional. In other words, this homicide on the theory of the state was murder if the appellant, after having shot down the officer and while in the act of escape from the cell finding Damberino confronting him, shot him down at a time when Damberino was unarmed and not shown to have done anything to him or taken any part in the search or made any effort to aid or abet in the search. If the jury adopted that theory it was murder, and the only answer of appellant made to it while on the witness stand, and the only other deduction fairly to be deduced from the testimony, was that the defendant while scared and frightened undertook to hide a pistol which he had on his person and which was accidentally discharged, and in some unaccountable way Damberino, not in the cell, not engaged in the fight, and not engaged in the affray, was shot down accidentally. The appellant says that when he emerged from the cell he found Damberino lying prostrate upon the floor, and that he did not shoot at all after he emerged from the cell. At no time in his statement of how the homicide occurred does he raise his defense upon the fact, if such

were the fact, that he was resisting an unlawful search of his person. We are assuming in this case that the search was unlawful. We are further assuming that Damberino was shot as he was walking toward the cell where the shooting was in progress as a result of the unlawful search; still we must be bound by what he says upon the witness stand. He had submitted without objection to the unlawful arrest. On his evidence he was not resisting the search, but only ran and was undertaking to hide a pistol which had nothing to do with his unlawful arrest or the unlawful search. There is authority to the effect that one who interposes a defense against the crime of murder that it is manslaughter because he shot in resisting an unlawful arrest must know at the time and be conscious of the fact that he is resisting an unlawful arrest. As to this we do not express an opinion. The witness makes no mention of any desire on his part to resist the search with force, but bases his entire defense upon the theory of accident.

In the case of *McPhay* v. *State,* 87 Miss. 456, 40 So. 17, on appeal from a life sentence where the conviction was upon these facts, "the testimony introduced by the state was to the effect that the deceased, McMorris, a policeman of the town of Summit, while riding on a bicycle at night in the streets of the town, and unaware of the presence of appellant, was waylaid and shot in the back by appellant. The fatal shot entered deceased's back just under the shoulder blade. The testimony for appellant tended to show that defendant did not see deceased until he jumped from his bicycle and drew a pistol on defendant, who fired to protect himself; that defendant did not know at the time he fired who deceased was, but thought he was one Saulsbury, an enemy, who had previously made threats against defendant."

Judge TRULY, as the organ of the court, said on this proposition: "The principle of law upon which the argument in support of that position is grounded is that the

homicide was committed in resisting an unlawful arrest, and hence was manslaughter only. . . . According to the story of appellant, the homicide was committed, not in resisting unlawful arrest, but in his own absolutely necessary self-defense. . . . Appellant, by his own testimony, did not attempt to justify his conduct by the plea that he was resisting an unlawful attempt to arrest him.''

In other words, our court held that the defendant might not raise this foreign issue of resisting an unlawful arrest and secure instructions on a theory not authorized by his testimony and not even asserted by the defendant as a reason for his action in the given case. The defendant in his version squarely planted himself upon the claim that the discharge of the pistol was accidental, or perhaps set up a claim of self-defense, which the court by its instructions submitted to the jury. There is no hint of resisting arrest in his evidence.

Of course the court should not have excluded Oliver's evidence as to the circumstances of the arrest tending to show an arrest without warrant was not on probable cause or reasonable ground to suspect that appellant had committed a felony, but appellant's evidence repudiates any theory of resisting arrest in this case, and hence the error reviewing the entire cause was harmless.

On the whole record we cannot see that the appellant has not had a fair and impartial trial.

The judgment of the court below is affirmed, and Friday, April 26, 1929, is fixed as the date of execution.

*Affirmed.*

ETHRIDGE, J. (*dissenting*). I think it was reversible error for the court below to refuse to permit the circumstances under which the arrest of the appellant was made to be shown in evidence. The opinion in chief concedes that it was error, but holds that it was not reversible error.

It is admitted that the officer had no warrant for the arrest of the appellant, and, that being true, the state should have justified the arrest by proving that the felony had actually been committed, and that there was probable cause for the officer to believe that the defendant was the person who committed that felony.

When one person undertakes to arrest another without a warrant for so doing having been issued by the proper officer, he must justify his action in making the arrest by showing a compliance with the law authorizing arrest without a warrant. Section 1265, Hemingway's Code of 1927 (section 1447, Code of 1906) provides that: "An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested. And in all cases of arrest without warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested on pursuit."

Under the statute, it is not sufficient for the officer to believe that a felony has been committed, and that the person to be arrested committed the felony; but the proof must show that the felony was actually committed, and that there was probable cause to believe that the person proposed to be arrested committed that felony. The officer's judgment as to the probable cause is not conclusive, but it is a judicial question for the court to determine from the facts and information upon which the officer acted, when the evidence in regard to the arrest is offered. The right of a citizen to be shielded from

arrest, except when authorized by law, is one of his most necessary and valued rights. Section 23 of the Constitution, in what is known as "The Bill of Rights" of the Constitution, was placed there for the purpose of preventing unjust and unwarranted seizures of the person or property of a citizen, or of a search of his person or property, except under the conditions named in said section. This section has been construed in the light of the common law, and it has been adjudged that the section prohibits all arrests which were unlawful at the common law. A person was not subject to arrest on the mere suspicion that a felony had been committed, or from the mere belief that it had been committed; but to justify the arrest there must be a felony committed, or there must be a criminal offense committed in the presence of the officer. If the felony had actually been committed, the officer could not arrest a person suspected of the commission of a felony, unless the facts and circumstances were such as to lead a reasonably prudent man to believe that he had done so; and where he arrested without a warrant, the lawfulness of the arrest depended upon the judicial finding that the proof was sufficient to warrant the officer in so believing.

It is true that the appellant had been arrested without a warrant before the commission of the offense for which he was indicted, and at the time the offense was committed he was in prison; but the officers had gone into the prison, and were there undertaking, without a search warrant, and without a warrant of any kind authorizing them so to do, to search the person of the defendant. If this search was unlawful, then the defendant had a right to resist it, and to use such force as was necessary to prevent the search being made; and if he misjudged the necessity, this would not render him guilty of murder, but of manslaughter only. There is nothing in the record to show a compliance with the law on this subject, and the act of the officer, as disclosed by the

evidence, in the absence of such justification, was an assault and battery upon the appellant.

In 2 R. C. L., p. 525, under heading "Definitions," we find the following definition of a battery: "A battery is the unlawful touching of the person of another by the aggressor himself or by any substance put in motion by him. A battery has in some instances been defined by statute to be any unlawful and willful use of force or violence on the person of another. The slightest unlawful touching of the person of another is a battery, for the law cannot draw the line between different degrees of violence, and therefore totally prohibits the first and lowest stage, as every man's person is sacred and no other has the right to touch it."

Section 1268, Hemingway's Code of 1927 (section 1450, Code of 1906), provides: "Every person making an arrest shall take the offender before the proper officer without unnecessary delay for examination of his case."

It was the duty of the officer in the present case immediately upon making the arrest to carry the prisoner to a justice of the peace, or to some other authorized officer, and make the necessary affidavit against him, and procure a warrant to admit him to the county jail. This appears not to have been done; consequently, the appellant was in the jail unlawfully, and the officer's right to search his person did not exist, because of his unlawful arrest and detention.

It is not true that, because a person submits to the initial unlawful act in making the arrest, he loses his right to resist a search made, or attempted to be made, after such time, and after he has been placed in jail. He has the right at any time, when unlawfully arrested, to use reasonable force to regain his liberty; and when the state's evidence was offered it was necessary to justify what was done by the officer, in order to make the proposed search lawful; and if it was not lawful, it certainly comes squarely within the provisions of section 1016,

Hemingway's Code of 1927 (section 1237, Code of 1906), set out in full in the court's opinion on the subject.

The soundness of the views expressed above are further borne out by the provisions of section 3304, Hemingway's Code of 1927 (section 4681, Code of 1906), which provides that: "It shall be the duty of every sheriff to keep a well-bound book, to be called the 'Jail-docket,' in which he shall note each warrant or *mittimus* by which any person shall be received into or placed in the jail of his county, entering the nature of the writ or warrant, by whom issued, the name of the prisoner, when received, the date of the arrest and commitment, for what crime or other cause the party is imprisoned, and on what authority;" etc. This section, construed with the preceding one, clearly shows that before a person can be lagally placed in jail, there must be a warrant or *mittimus* issued justifying his commitment.

It appears to me that this case comes squarely within the principles of the decision of this court in *Williams* v. *State*, 122 Miss. 151, 84 So. 8. In that case, when the cause was first considered, the judges of this court were equally divided as to whether the judgment should be reversed, the affirming judges holding that the facts there involved made it a question for the jury as to whether the killing by such person was unnecessary; but on a suggestion of error being filed, one of the original affirming judges, after a careful study of the facts and the law, changed his mind, and concurred in the opinion originally written by Judge HOLDEN, in which the law of the offense, and the effect of section 1237, Code of 1906, *supra,* was discussed, and the conclusion reached that the offense could not be greater than manslaughter. It is true, in that case the officer searched the defendant, and, not finding the pistol for which they were searching, and which they believed he had, administered to him a whipping, to avoid which the defendant agreed to go and point out where the pistol was, but on the way to the place where he

stated it to be he pulled the pistol from his person and fired, killing one of the officers.

The authorities bearing upon section 1016, Hemingway's Code of 1927 (section 1237, Code of 1906) set forth in Judge Holden's opinion in that case, sustained the conclusions therein reached—the principles of which I think should be applied in this case. See the authorities therein cited, especially *Cryer* v. *State,* 71 Miss. 467, 14 So. 261, 42 Am. St. Rep. 473.

In *Williams* v. *State,* 127 Miss. 851, 90 So. 705, a different case from the one above cited, it was held by the court that: ''A felonious homicide is 'manslaughter,' and not murder, first, when the defendant killed the deceased either in the heat of passion, without malice, by the use of a deadly weapon, without authority of law, and not in necessary self-defense, or, second, when the defendant killed the deceased without malice, under the *bona-fide* belief, without reasonable cause therefor, that it was necessary for him so to do in order to prevent the deceased from inflicting death or great bodily harm upon him, or, third, when the defendant unnecessarily killed the deceased while resisting an attempt by the deceased to commit a crime.''

It was also held that: ''When it appears from the evidence in a trial for murder that the defendant killed the deceased in resisting an attempt by the deceased to commit a crime, it is error to refuse an instruction requested by the defendant directing the jury not to convict him of the crime of murder.''

Other authorities are referred to in the various opinions in this case.

It seems to me that these cases conclusively settle the principle that if the officer was acting unlawfully at the time of the killing, and his act amounted to a crime upon the defendant, the killing could not amount to more than manslaughter, and would amount to manslaughter only

if it were unnecessary to kill in order to protect and secure the rights of the defendant.

It appears, as I think, from the state's testimony, that the act of the officer at the time of the killing was unlawful and criminal. The fact that the shot went wild and killed the bystander and assistant of the officer does not change the character of the killing. The crime of killing an assistant or a bystander would have the same effect in law as would be the case had the shot killed the officer. Consequently, the instructions on manslaughter requested, as set out in the opinion in chief, should have been given, and not refused.

The prevailing opinion relies upon *McPhay v. State,* 87 Miss. 456, 40 So. 17, for its conclusion that the defendant was bound by his own version of the killing—that he is bound by his testimony to the effect that he did not fire the shot intentionally, but that it was the result of accident, while attempting to hide the pistol from the officer.

I do not think this case is any authority for that proposition whatever. In that case the state, in its testimony, did not make a case from which any conclusion of unlawful arrest could be reached. I think a defendant has a right to avail himself of any defense possible from the state's evidence, regardless of his own theory or his own testimony. It is true, the jury may disregard the defendant's testimony and his theory of the case, where there is a conflict in the evidence, and adopt that of the state; but when it does so, the defendant is entitled to avail himself of every theory in the state's evidence that would reduce the degree of the crime, and is entitled to have the jury consider those theories under appropriate instructions, stating the law applicable thereto.

In the *McPhay case, supra,* the statement of the facts shows that the testimony introduced by the state was to the effect that the deceased, McMorris, a policeman of the town of Summit, was waylaid and shot in the back

by appellant, while riding at night on a bicycle in the streets of the town and unaware of the presence of appellant, the shot entering just under the shoulder blade. Therefore, the state's theory in that case left no probability of manslaughter. The statement of facts further tends to show that the appellant in that case did not see the deceased until he jumped from his bicycle and drew a pistol on him, and fired to protect himself; that the appellant did not know until he fired who the deceased was, but thought he was one Saulsbury, an enemy who had previously made threats against him.

There is not a hint in the statement of the case that any unlawful arrest was attempted in that case. Neither the state nor the defendant made a case in which there was any theory of arrest, lawful or unlawful; neither thought that an arrest was being made, or that search was being made; and therefore there was no evidence upon which to build an argument of the rights involved in resisting arrest, and the court properly disregarded the argument in the brief, which sought to advance the theory of manslaughter while resisting unlawful arrest. What the court says in an opinion is always to be considered in the light of the facts of the case before it. The court said in the opinion, in reference to this: "It is, however, not necessary for us to enter upon any consideration of the accuracy of the legal proposition invoked, because, conceding its abstract soundness, it is not controlling in the instant case. According to the story of appellant, the homicide was committed, not in resisting unlawful arrest, but in his own absolutely necessary self-defense."

It is clearly apparent, therefore, from this opinion, that, so far as the evidence was concerned, there was nothing whatever to support any theory of a killing to resist unlawful arrest; and the court properly refused to consider the law on that subject, in a case to which it was not applicable.

In the case before us, the evidence of the state itself shows a hypothesis that the killing was manslaughter, and the defendant was clearly entitled to have the law on that subject announced, and the three instructions set out in the prevailing opinion should have been given. The state's own evidence presents the hypothesis upon which such instructions should have been given, by failing to prove that the defendant was lawfully arrested, and, therefore, under the lawful duty to submit to the search attempted to be made at the time.

Furthermore, there was evidence in the record from which the jury could reasonably infer that the officer, Oliver, assaulted the appellant with his club or "billy" to make him submit to the search, to which, under the facts before us, he was not legally compelled to submit.

In the *Williams case, supra,* the defense is that appellant was resisting an attempt to kill him, and that he was acting in self-defense. The jury disregarded his plea of self-defense, and convicted him of murder; but the court held that he was entitled to avail himself of the hypothesis of manslaughter shown by the evidence for the state, as well as for the defense.

The law does not desire a wrongful conviction of any man. It is the policy of the law for him to receive the benefit of any theory in the evidence, either by the state or the defense, which would either acquit him of the crime or reduce the crime below the degree of that charged in the indictment.

Because of the errors indicated, I think the judgment of conviction should be reversed, and the cause remanded for a new trial, in which the facts bearing on the arrest and search may be fully inquired into; and after such inquiry should be submitted to the jury on appropriate instructions.

Judges Griffith and Anderson concur in this opinion.