# FRANKLIN *et al. v.* STATE.

(In Banc. June 10, 1940. Suggestion of Error Overruled July 1, 1940.)

[196 So. 787. No. 34119.]

O. C. Luper and G. M. Milloy, both of Prentiss, for appellant, Hilton Fortenberry.

**T. B. Davis**, of Columbia, and **E. J. Currie**, of Hatties-
burg, for appellant, Jerome Franklin.

**T. B. Davis,** of Columbia, for appellant, Jerome Franklin.

**W. D. Conn, Jr.**, Assistant Attorney-General, for appellee.

Livingston & Livingston, of Prentiss, for appellee.

Argued orally by **T. B. Davis** and **E. J. Currie,** for appellant, Jerome Franklin, and **G. M. Milloy,** for appellant, Hilton Fortenberry, and by **W. D. Conn, Jr.,** and **W. H. Livingston,** for appellee.

**McGowen, J.**, delivered the opinion of the court.

On January 4, 1940, an indictment was filed by the Grand Jury of Jefferson Davis County charging Jerome Franklin, Hilton, alias "Sacks" Fortenberry, and Fred Polk, alias "Dock" Polk, with murder in the killing of J. C. Sanford.

Franklin and Fortenberry were placed on trial without a severance as to Fred Polk who had not been arrested at the time of the trial.

On January 9, 1940, the court overruled appellants' motion for a change of venue, and on the day sustained appellants' motion for a special venire, and directed that eighty-five persons be summoned to serve. On January 12, appellants renewed their motion for a change of venue and on that day the court again overruled that motion and the cause proceeded to trial. On the following day the jury returned a verdict of guilty as charged as to both appellants, and the judgment of the court ordered them to be executed. Subsequently at that term of court their motion for a new trial was overruled.

In this court there are presented twenty-one assignments of error, but we shall consider only those errors which to us seem to be the strongest and to evoke an opinion from us.

(1) It is insisted that this case should be reversed because the court erred in not granting appellants a change of venue.

The appellants rested their motion on their affidavits and those of two other persons that they could not secure a fair and impartial trial because of the prejudgment of the case by the citizens of that county. These affidavits made out a prima facie case for the appellants for a change of venue.

The state then offered thirteen witnesses in opposition to the motion, including the sheriff and the district attorney. The substance of their evidence was that Sanford, the deceased, was an exceedingly popular man, well

known among the people of the county; that the homicide had caused universal grief and shock, but that the appellants were unknown negroes and there did not seem to be indignation against anyone except guilty parties. They thought appellants could and would receive a fair and impartial trial, and the witnesses seemed to have a thorough appreciation of what constituted a fair and impartial trial.

These witnesses came from the several supervisors' districts of the county. The local paper had published a very earnest appeal to the citizens of the county for law enforcement and especially as to intoxicating liquor laws. This paper has a large circulation in that county, but the witnesses regarded the article as the opinion of the editor and did not enter into great detail as to the fact of the homicide.

One or more newspapers published at Hattiesburg or Jackson had published a statement that a mass meeting had been held in the county at which it was decided not to mob the appellants, but let the law take its course. No one of the witnesses had heard of such a mass meeting and the sheriff and district attorney were positive that no such meeting had occurred. Members of the state guard were present on the order of the Governor. The sheriff said they were there at court because he had heard of some threat as coming from Simpson, an adjoining county, but there had been no disorder or inflammatory action of the people of Jefferson Davis County.

The voir dire examination of the special venire and the jurors who tried the case is not in this record. It was agreed, however, in the record that fifty-two of the special veniremen were examined, thirteen of whom disqualified themselves because of their prejudgment of the case. The state exercised four peremptory challenges while the appellants exhausted their twelve challenges and were allowed an additional challenge as to a juror whom they had challenged for cause and that challenge overruled by the court.

We cannot say that the court erred in denying a change of venue on the evidence which controverts and contradicts the prima facie case made by the appellants. On this conflict in the evidence the trial judge had a most decided advantage of us. He saw the demeanor of the veniremen, heard the answers. This important part of this trial is not here in the record, that is, the voir dire examination of the veniremen and jurors who finally tried the case.

We recently took occasion in the case of Garrett v. State, 193 So. 452, 458, to set out painstakingly what constituted a prejudgment of a case, and in that case we said: "Inasmuch as the record does not disclose who served on the jury and the answers to questions of the judge, we must assume that a proper jury was selected. Neither the court nor counsel should accept a nod or a shake of the head in lieu of an answer to a question. In such cases, this Court cannot reverse the decision of the judge but must accept it, on the theory that he saw things not recorded in the record."

In the case at bar we are bound to assume that the answer of the jurors which is not before us, which the judge heard, demonstrated that there was no prejudgment of this cause. We cannot say that because fifty-two persons were examined, and thirteen disqualified themselves because of their fixed opinions, that this demonstrates a prejudgment by the people of that county. Such a criterion amounts to practically nothing. Likewise as to challenges exercised. The case cited above is infinitely stronger for a change of venue than the case before us here.

An application for a change of venue is addressed to the sound discretion of the trial judge, and his ruling thereon will not be reversed on appeal unless it clearly appears that his ruling thereon is against the weight of the evidence, and it must appear that the trial judge has abused such discretion, and in passing upon the action of the trial judge this court will look to the completed trial

including the voir dire examination of the jurors to ascertain if the defendants have received a fair and impartial trial. Mackie v. State, 138 Miss. 740, 103 So. 379; Wexler v. State, 167 Miss. 464, 142 So. 501; Cummins v. State, 144 Miss. 634, 110 So. 206; Fischer v. State. 145 Miss. 116, 110 So. 361; Richardson v. State, 153 Miss. 654, 121 So. 284; Myers v. State, 167 Miss. 76, 147 So. 308.

The completed trial as revealed to us by this record discloses no abuse of his sound discretion by the trial judge in overruling the motion for a change of venue.

(2) There is no chance to reverse this case because appellants urge upon us that the indictment and trial of appellant was had so promptly after the homicide and as they say "exceeded the speed limit." It was not intimated in the court below that appellants desired a continuance or any delay of the case. Franklin was represented by his own selected counsel and Fortenberry by two members of the bar appointed by the court. Both appellants had the benefit of able counsel, who left no stone unturned in their defense. No application for delay or continuance was made to the court and there appears to us no sound reason for the court to have acted herein on its own volition.

(3) It is insisted that the court erred in its refusal to grant an instruction requested by the appellants limiting their conviction to no higher crime than manslaughter, thereby acquitting the appellants of murder. This assignment is based upon the theory of appellants, that the attempted search or attempted arrest was made by the officers of the law without a search warrant and was without probable cause.

On this point we state the facts as to probable cause, which we deem essential.

On January 1, 1940, and for two years prior thereto, Willie Barnes, a negro, was employed by the city as a laborer in its electric light department. Mr. Hance Polk was the marshal of the municipality of Prentiss, and Barnes had assisted Polk in securing evidence in the

detection of violation of the prohibition laws on occasions. On this date Barnes, having gone to Columbia, Mississippi, to see his girl and be there, met Dock Polk at the place of business of Franklin. Dock Polk told Barnes that he and Franklin were going to carry a load of whisky to Prentiss and would leave Columbia about sundown with a load from the "Y," Franklin's place of business. Polk then and there exhibited a container of whisky to Barnes, tried to sell Barnes some of it, and invited the latter to accompany him; Dock Polk, and Franklin on the trip to Prentiss, to which Barnes assented.

Barnes went to the telephone exchange, called the marshal of Prentiss, Hance Polk, and told Mr. Polk that Franklin and Dock Polk would be at the "detour in Prentiss with a load of liquor about dark" and that he, Barnes, would accompany them. In his examination in chief before the jury, officer Polk testified that Barnes told him that they, Franklin, Barnes and Polk were coming in a car. The officer testified that he knew the occupants of the car and they knew him. That he knew Franklin's car, and had information that Franklin was handling liquor.

Barnes joined the party at the time to leave. Franklin drove his car. In containers they had forty gallons of whisky, 10 gallons in the rear of the four-door sedan where Barnes and Fortenberry were seated, Franklin on the front seat with Dock Polk seated to his right. After the car of rumrunners left the "Y," they drove a short distance to Franklin's house, where he left the car, entered his dwelling, and came out with a pair of "coveralls" for himself and a thirty-two Winchester rifle, which he handed to appellant, Fortenberry. Whereupon Sacks Fortenberry asked Franklin: "Have you got any more cartridges?" And Franklin replied: "There's sixteen in the rifle. There's enough in there if anything should happen to occur."

The party of rumrunners did not reach Prentiss by dark because they drove to various points between Columbia,

Mississippi, and Prentiss, and were delayed by sales and deliveries of whisky, but did reach the detour in Prentiss about ten o'clock that night.

Returning to the action of the marshal—after Barnes communicated over the phone as to the load of whisky, the marshal testified that he did not have time, according to that information, to procure a search warrant. On that day the sheriff and other officials had been inducted into office for the several terms.

The marshal reported to the sheriff's office, and A. H. Polk, the ex-sheriff who had retired that day, J. C. Sanford, the constable of that district, Fred Burrow, and the marshal proceeded to this detour, which was about eight hundred feet in length. The officers were in two cars. They parked the cars in the detour back from the opening so as to block it, a driver remaining in each car. When the car in which the rumrunners were driving came into the detour, the marshal and Mr. Sanford went rapidly toward it, in the glare of its car lights, waving flashlights as a signal for them to halt. They ignored the flashlights and drove to the barricade of cars. Franklin, the driver of the whisky car, then proceeded to back, and backed into a ditch, and as he did so, Sanford, the deceased, walked in front of the whisky car in the light over to the other side, Polk remaining on the left-hand side. Thereupon someone in the car said "That's the law" and Sanford replied "This is the law, stop" or halt. At that moment a number of shots were fired from the whisky car, which proceeded to back, and the marshal ran after the car, but when a bullet came near he dropped down in the bushes on the side of the road. After the car was gone it was discovered that Sanford was lying there dead with three bullet wounds in his chest which had caused his death. Barnes, who was in the car, testified that Fortenberry did the shooting with a rifle. One shot was discharged through the windshield and the others through the window-glass of the door on his side. Barnes testified that before any shooting he called out, "That's the

law,'' and he heard one of the officers say, ''It is the law, stop.'' Dock Polk called out ''Dont' shoot.'' One of the bullet wounds in the chest of the deceased was percept-ibly larger than the other two, but he accounted for that by the statement that two bullets might have gone in the same hole.

The appellants drove to Columbia according to their statement, whereupon Fortenberry took the rifle and the car, and, according to his statement made to the officers, he threw the rifle into Lake Pontchartrain, proceeded to New Orleans, and from thence to Texas where he was arrested. Dock Polk had never been arrested at the time of the trial. In his confession, Fortenberry's claim was that he shot only one time and that he was aroused by someone's shooting at them. All the testimony in this record from those present at the time of the homicide was that no shots were fired at that time except from the whisky car, but that the marshal, after the rumrunning car had gotten away from the immediate scene of the homicide, discharged his pistol, and did by his shot deflate one of the rear tires.

(1) There is no merit whatever in the contention that the statement made by Barnes over the telephone to the marshal was hearsay testimony as shown by this record. It was a clear cut statement of fact upon which the officer and his associates acted on the night of this tragedy.

(2) It is insisted that by the information given to the officer from Barnes it did not appear what character of instrumentality was being used in transporting the whiskey on that night, and therefore the description under Section 23, Constitution of 1890, was wholly insufficient, and even if Barnes had told Polk that the appellants were coming in a car that such description would not be sufficient to justify the arrest and search of the car on probable cause.

The first answer is that the record as detailed in this opinion showed that the marshal testified before the

jury on direct examination that Barnes informed him that the parties would come to Prentiss with a load of whisky in a car, and that he, Barnes, would be with them. In the second place it is hard to conceive of a more accurate description of the particular thing to be searched than is disclosed by this record. Polk, the marshal, knew the defendant, Franklin, and he certainly knew Barnes well. Barnes told him that he would be with the appellants and the load of whiskey. If he had told him that he would be in a Plymouth, four-door Sedan, car, with a designated number and a designated tag, the car would not have been as easy of identification in the night-time. When he was informed by Barnes that the latter would be in the car—that was equivalent to a flag so far as the information to the marshal was concerned, or equivalent to a voice saying in thunder tones: "This is the car loaded with whisky." If the car in question had been described in an affidavit as a car driven from Columbia, Mississippi, to the particular detour in the town of Prentiss, and the occupants thereof would be Polk, Franklin, and Barnes, it would have complied in all respects with the law as announced in the leading case of Moore v. State, 138 Miss. 116, 103 So. 483. Also see Story v. City of Greenwood, 153 Miss. 755, 121 So. 481; and Parks v. State, 180 Miss. 763, 178 So. 473. We conclude that the description of the instrumentality used in the unlawful transportation of whisky on the occasion was adequate and sufficient and was just as informative to the officer as if the tag number and make of the car had been given him, if not more complete. The evidence was not incompetent because of want of probable cause for any reason.

There is another reason why the instruction as to manslaughter was not proper in this case. When Fortenberry discharged this rifle, the evidence discloses without dispute that no one of the parties engaged in the arrest or search made any demonstration of any kind to harm the appellants with any deadly weapon or otherwise. The officers simply barricaded the road and called on the

driver of the car to halt, which was ignored by the appellants. Fortenberry, as far as this record shows, used the most deadly possible force, situated as he was, upon these officers without caring whether the arrest and search was lawful or unlawful.

This court said in the case of Walker v. State, 189 So. 804, 806, that ''Where the arrest is unlawful the person arrested has the right, under the law, to use the necessary force to free himself.'' The facts in the record show that the slaying of Sanford was wholly unnecessary, unprovoked and unwarranted.

It is urged on behalf of the appellant, Franklin, that under the circumstances of this case he cannot be held responsible for the act of Fortenberry in slaying Sanford. He argues that there was no evidence that he entered into any conspiracy with Fortenberry or anybody else, or that he was responsible for the act of Fortenberry because the latter acted upon his own unexpected volition. We are of opinion that when the occupants of this whisky car started upon their mission on that night, they immediately began and continued to act together in the commission of a crime. It is unlawful in this state to transport or have in possession intoxicating liquor. They had forty gallons in the car and had been selling and delivering whisky on that night. When Franklin handed Fortenberry, one of the occupants of the car, a thirty-two Winchester rifle, and when Fortenberry wanted more cartridges, he replied: ''There's sixteen in the rifle. There's enough in there if anything should happen to occur.'' They did not have to sit down and have a long conversation for Fortenberry and Franklin to understand each other. Franklin was the owner of the car and the part owner of the whisky. He was driving the car in the commission of a crime. He procured the gun and put it into the hands of his gunman, Fortenberry, with the assurance that sixteen cartridges would be sufficient to halt any man who undertook to oppose them in the carrying on of their unlawful crime, and, at the moment when the

officers had called on them to halt and informed them it was the law, Franklin began driving backward while Fortenberry began shooting. They were joint actors, Franklin and Fortenberry, in the commission of the crime and each is responsible for the act of the other. This is a clearer case of acting in concert for a conspiracy than usually comes to the attention of this court in cases of this character.

The rule in this state is found in the case of Lusk v. State, 64 Miss. 845, 2 So. 256, 257, in this language: "Where parties combine to commit crime, the law imputes the guilt of each to all thus engaged, and pronounces all guilty of any crime committed by any, in the execution of the common purpose, as one of its natural and probable consequences, even though none of the parties intended at the outset to do the particular thing constituting the crime. If the act is not the natural and probable outcome of the common design, but is the independant act of some of the party, conceived of by them, and outside of the common purpose, those not participating in it are not responsible for this independent act."

In the above case several parties joined together in committing a trespass upon a home, and after driving the occupants and owners therefrom, the home was burned by some one of the parties. Lusk was held guilty although he was not shown to have conspired to burn the home. This same doctrine has been approved by this court in Fisher v. State, 150 Miss. 206, 116 So. 746; Woodward v. State, 166 Miss. 596, 143 So. 859; Odom v. State, 172 Miss. 687, 161 So. 141; and Carrol v. State, 183 Miss. 1, 183 So. 703.

From the bootlegger's standpoint there was considerable value in this whisky. Franklin had more interest in getting it away from confiscation by the officers or someone who might undertake to seize it. Therefore, he was more interested in its protection, and it was he who first conceived the idea of protecting it with a gun, a thirty-two Winchester rifle, equipped with cartridges

designed to produce death.  In his confession he undertook to say that he was delivering the rifle to another person, but it could hardly be said that it was necessary to have sixteen cartridges along in case anything happened to occur.

The officers in this case acted upon probable cause. The crime was not limited to manslaughter.  Without conflict in this evidence the appellants were guilty of an unprovoked murder, and there was no error in refusing a manslaughter instruction.

We are of opinion that there was no reversible error in the instructions of the court, nor in the argument of the district attorney before the jury, nor was the appellant entitled to a mistrial because the venireman said in the presence of the others upon his trial that he thought they were guilty, nor in any of the other points assigned as error in this case.  We think the verdict of the jury was proper in this case.  In fact, the evidence was not in dispute.

Friday, July 19th, is fixed as the date of execution of the appellants.

Affirmed.