185 So.2d 452 (1966)
Addie Clark HARDING
v.
ESTATE of George C. HARDING, Deceased, Oscar B. Ladner, Executor, Leonard D. Ball, Jr., Beneficiary.
No. 43872.
Supreme Court of Mississippi.
April 18, 1966.
Thomas L. Wallace, Lawrence Semski, Biloxi, Joseph B. Gilbert, Chicago, Ill., for appellant.
Bidwell Adam, Gulfport, Albert Sidney Johnston, Jr., Biloxi, for appellee.
BRADY, Justice.
This cause involves a jury verdict and a decree based thereon of the Chancery Court of Harrison County, Mississippi, Honorable L.C. Corban presiding as Special Chancellor. The petition alleged that the beneficiary *453 conspired with the attorney, Oscar B. Ladner, to obtain the estate of the decedent. The jury held that the will of the deceased was not procured by any undue influence, and that George C. Harding, the testator, had testamentary capacity. From that judgment this appeal is prosecuted.
The controlling facts in this case are as follows: Mr. and Mrs. George C. Harding, who had no children, resided in Biloxi in Harrison County, where they owned a modest home. Subsequent to the death of Mr. Harding's wife in 1954, he resided alone and led a rather secluded life. Approximately ten or eleven months prior to his death, Mr. Harding became acquainted with the beneficiary, Leonard D. Ball, Jr., who was selling cemetery lots. Mr. Harding purchased from Mr. Ball two cemetery lots on July 7, 1961, for which he paid the sum of $235 to Mr. Ball's employer.
The record discloses that subsequent to this time Mr. Ball made calls at Mr. Harding's home and drove him to the store and to town on different occasions to purchase groceries and for other purposes. Mr. Harding visited in the home of Mr. and Mrs. Ball for dinner or coffee on various occasions and they visited Mr. Harding on Sunday afternoons. Mr. Ball took Mr. Harding to Chicago in November 1961. Mr. Harding took up a lot of time with the two younger children, talked to the two older boys about their studies for medical school and how they were going to get through school; he admired and respected the boys for working to help put themselves through college.
It is evident the maid who worked in Mr. Ball's home spent one day a week in cleaning Mr. Harding's home from June to December 1961. The maid was carried to Mr. Harding's home by Mr. Ball and was paid by Mr. Ball.
On September 11, 1961, the will in question was made. The pertinent facts involved in the execution of the will are as follows. On this date Mr. Ball took Mr. Harding to the office of Mr. Oscar B. Ladner, an attorney, in Gulfport. This appointment was made for Mr. Harding by Mr. Ball. Mr. Ladner and his secretary both testified that neither Mr. Ball nor Mr. Harding was known to them prior to this date. One of the office girls who was a witness to the will testified that Mr. Harding had been in the office previously and that she had previously seen Mr. Ball in the office with Mr. Harding several times but that it might have been on the same day, since both had been in and out of the office.
The record discloses that when Mr. Ladner learned that Mr. Harding wanted to make his will, he immediately sent Mr. Ball from the office; that upon learning that Mr. Harding had a niece who was alive and that he wished to completely exclude her from his will and leave everything he owned to Mr. Ball, Mr. Ladner decided it would be wise to send Mr. Harding to a physician for a medical examination. He also considered the fact that Mr. Harding was eighty-one years of age and he had just met him and knew nothing of his past medical history. The will was dictated, and the secretary read it back to Mr. Ladner and Mr. Harding to insure that she had it correctly. The will named Mr. Ladner as executor. An appointment was made with Dr. Edward C. Hamilton, a practicing physician of Gulfport, Mississippi, for a medical examination of Mr. Harding.
Dr. Hamilton spent about thirty minutes talking with Mr. Harding. At the end of the interview it was his opinion that Mr. Harding seemed to be an intelligent man with a wide range of interests, and that he was rational and of sound mind. Dr. Hamilton telephoned Mr. Ladner to communicate his opinion to him and then sent him a letter containing his opinion. The letter stated that Mr. Harding "seemed to be an outgoing individual, who was well aware of what he was doing, and why he wanted to do it. * * * I believe that this man, above named, is completely sound in mind and body, within the framework of his general age group, and certainly is competent to make a will."
*454 After the medical examination Mr. Harding returned to the office with Mr. Ball, who had taken him to the doctor's office. Mr. Harding alone entered Mr. Ladner's private office. Mr. Harding read the will and said, "yes, that is what I want." Mr. Harding, in the presence of three attesting witnesses and Mr. Ladner, acknowledged that the instrument was his will. He signed the will in the presence of these three witnesses and Mr. Ladner, and the witnesses signed the will in the presence of Mr. Harding, Mr. Ladner, and in the presence of each other. Mr. Harding, in a private conversation with Mrs. Birch, a resident of California, a witness to the will, said that he did not have any relatives and that he wanted to give all this to Mr. Ball. Mr. Harding had informed Mr. Ladner that he used to have a niece in Chicago but he had disowned her fourteen years ago when she and her lawyer beat him out of some money when an estate was settled; that he had not seen her and did not know if she was still alive or not; that he did not want to leave his money to her, and he did want to leave it to Mr. Ball because Mr. Ball had two sons who were going to medical school, and a child who was an invalid.
On September 11, 1961, the date the will was made, Mr. Harding and Mr. Ball called at the First National Bank of Biloxi. Mr. Harding had Mr. Ben F. Wimberly, the vice-president and cashier, sell part of Mr. Harding's stock. The proceeds of the sale, $22,456.32, less commissions, were deposited to Mr. Harding's account. Mr. Harding went to his safety deposit box alone and the transaction with Mr. Wimberly was consummated in five or ten minutes. Mr. Wimberly, on cross-examination, in response to questions concerning Mr. Harding's physical and mental condition on September 11, 1961, stated: "He seemed all right to me."
On September 20, 1961, Mr. Harding signed two checks, one for $9,000 and one for $10,000, payable to Ball and written by Mr. Ball. They were endorsed by Mr. Ball and deposited to the account of his wife, Mrs. Helen Ball. There were three more checks totaling $700 drawn on the account, all signed by Mr. Harding and all payable to Ball and in Ball's handwriting. Mrs. Ball testified that Mr. Harding explained to her at her home that the checks for the $9,000 and the $10,000 which he had given to her husband were to see that the two boys were educated in college and that they had the professions they wanted. Also, he wanted to see if medical science could do anything for the afflicted child. She testified that on the date she received the checks Mr. Harding was just like he had always been.
The testimony of the witnesses for the contestant was substantially as follows: That Mr. Ball visited Mr. Harding regularly; that Mr. Harding suffered from loss of memory, talked at times childishly, was old, and reminisced about the past; that he got upset about a stock-split of the Texaco Company and about a letter he received from the Internal Revenue Service; that he had failed to get to the bathroom on time, overlooked paying his property taxes, carried blank checks which had been signed but not filled in, once wanted to see "Gunsmoke" on TV in the morning when it was an evening's program; that Mr. Harding could not understand why one or more of his checks had bounced when he had money in the bank (apparently in a savings account); that he talked about his stock a great deal of the time and that the stock provided about $60 of his $200 monthly income; and that he indicated he had an arrangement with Mr. Ball about his money.
One of these witnesses for the contestant testified that Mr. Harding talked constantly about his family but that he did not care very much for any of his family; that he especially did not care for the contestant. He had not seen her in years, he did not write to her, she didn't come to his wife's funeral, and she had never been in the contestant's hometown until she came down for this suit.
On November 2, 1961, Mr. Harding was admitted to the Veterans' Administration Hospital, where he remained until November *455 24, 1961. He was again admitted on December 10, 1961, when his illness was diagnosed as senility, cerebral arteriosclerosis, and malnutrition. He remained there until January 11, 1962, the date of his death.
Dr. Andioun, the staff physician from the V.A. Hospital, made the above diagnosis, dated December 11, 1961. He was called as a witness by the contestant, and his testimony supported the diagnosis made of Mr. Harding on December 11, 1961. On cross-examination, the staff physician stated that he would be unable to testify as to Mr. Harding's condition on September 11, 1961, the date of the will, and that he could not say that Mr. Harding did not have the mental capacity to make a will on that date.
At the conclusion of all the evidence, the contestant's motion for a directed verdict was properly overruled. In Maguire v. Carmichael, 240 Miss. 732, 737, 128 So.2d 581, 583 (1961), we stated:
On the movant's request for a peremptory instruction, the court must keep in mind that the evidence for the opposite party must be treated as proving every fact favorable to his case which is established either directly or by reasonable inference.
The contestant's motions for judgment notwithstanding the verdict and for a new trial were also properly overruled.
In Gathings v. Howard, 122 Miss. 355, 84 So. 240 (1920), the testator's heirs and next of kin, who had moved away and had little communication and few visits to the testator's home, contested the will, which devised and bequeathed most of the property to a faithful Negro servant, and to a friend and neighbor who was named as executor. This Court stated:
The court has repeatedly emphasized the rule of law that  "A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice." (Authorities cited.) (122 Miss. at 383, 84 So. at 246.)
The relationship of Mr. Ball and Mr. Harding was not a conventional fiduciary relationship such as physician and patient, attorney and client, guardian and ward, trustee and cestui que trust, etc. Therefore, the issue of the extent of the relationship and the probable influence upon the testator growing out of the relationship was properly submitted to the jury.
As we stated in Barber v. McClure, 250 Miss. 396, 404, 165 So.2d 156, 160 (1964), quoting from Jamison v. Jamison, 96 Miss. 288, 298, 51 So. 130, 131 (1909): "`As to what is sufficient must depend upon the facts and circumstances of each particular case.' (Emphasis supplied)."
The questions of mental capacity and whether the will was a product of undue influence or of a confidential relationship were submitted to the jury with elaborate instructions for both sides and the jury resolved the questions in favor of the proponents of the will, and against the contestant. Viewing the testimony and exhibits as a whole, we hold that there was ample evidence to support the finding of the jury on all questions.
The contestant further assigns as error the following: "The Court erred in overruling the Contestant's motion to withdraw the juror, S.J. Dauro."
The pertinent facts are as follows: After the jury had been accepted by both sides, empaneled and sworn, but before any evidence was taken, S.J. Dauro announced that he wanted to make a statement to the court. The jury was excused. Mr. Dauro asked that he be excused from the jury for the reason he suddenly realized that he knew Mr. Ball and his wife, Mr. Ball's father-in-law and entire family. He stated that he could be fair, but that he believed something could come up later; that if Mr. Ball did not think it was right, Mr. Ball might hold it against him and that he didn't *456 think it would be fair for him to go ahead and serve. Counsel for the contestant stated: "We would challenge him for cause, Judge." The chancellor stated that in a small town nearly everybody knew everybody else. In response to the chancellor's questions, Mr. Dauro stated that he was not obligated to Ball, not prejudiced against Ball, and that he lived in Long Beach but had known Ball for years in Gulfport; that he could be fair; that he had never visited in Ball's home; that he just knew the lady he married and knew that Ball worked in Gulfport.
The chancellor overruled the challenge for cause but, realizing that counsel had accepted the juror on the basis of the questions on voir dire, stated to counsel for the contestant: "Suppose he had answered just like he has answered now, you might have exercised your objection." Counsel responded: "I might have. I couldn't say now what I would have done then had I known it." Counsel for the appellant had exercised only three of the peremptory challenges.
This Court, in American Creosote Works of Louisiana v. Harp, 215 Miss. 5, 15, 60 So.2d 514, 518, 35 A.L.R.2d 603 (1952), stated:
There is no showing in the record that appellant exhausted its peremptory challenges. Before the trial court could be put in error for denying a challenge for cause the record should show that the complaining party exhausted his peremptory challenges. Bone v. State, 207 Miss. 20, 41 So.2d 347; Richardson v. State, 153 Miss. 654, 121 So. 284; Cummins v. State, 144 Miss. 634, 110 So. 206; Shubert v. State, 66 Miss. 446, 6 So. 238; 50 C.J.S., Juries, § 256.
In 50 C.J.S. Juries § 228, at 975 (1947), it is stated:
A person is not incompetent as a juror merely because he knows, or is a neighbor, or an intimate acquaintance, of, or on friendly relations with, one of the parties, or members of his family * * *. (Emphasis added.)
In view of the fact that the questioning of the juror clearly shows that he was not partial to, or prejudiced against, either of the parties, and that he could try the case fairly, the chancellor was correct in overruling the challenge for cause, and the rights of the contestant were not prejudiced thereby.
We have carefully reviewed the record, studied the briefs and controlling authorities, and reach the inescapable conclusion that there are no reversible errors in this cause. The chancellor properly found that there was no proof in the record of any conspiracy between Mr. Ball and Mr. Ladner to obtain the estate of the decedent, which was admitted by contestant's counsel. Furthermore, the record clearly reveals that Attorney Ladner was not only exemplary in his conduct but was sagacious in the preparation and execution of his client's will.
For the foregoing reasons, the decree of the astute chancellor is hereby affirmed.
Affirmed.
ETHRIDGE, C.J., and RODGERS, PATTERSON and INZER, JJ., concur.